HOULIHAN ET AL. *v.* McCALL ET AL.

[No. 74, October Term, 1950.]

*Decided February 7, 1951.*

132

The cause was argued before MARBURY, C. J., and DELAPLAINE, HENDERSON and MARKELL, JJ.

*Robert D. Bartlett,* with whom was *Ernest N. Cory, Jr.,* on the brief, for the appellants.

*Edward C. Bell, Jr.,* with whom were *Green, Whalin, Babcock & Bell* and *Walter L. Green* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from four judgments in favor of the appellees for damages sustained in a collision on November 24, 1948, between an automobile and a truck at the intersection of Greenbelt Road and Rhode Island Avenue in Prince George's County. Greenbelt Road runs east and west. To the east of the intersection it is 28 feet wide, gradually extending to 64 feet in width west of the intersection. Rhode Island Avenue consists of two separate roads on each side of trolley tracks in the center. The total width of the right of way including the trolley tracks is 125 feet, but the road on the east is only a dirt road serving a few houses. The road with which we are concerned is the one to the west of the trolley tracks which is paved, used by traffic moving in both directions, and 16 feet in width. The width of Greenbelt Road at this point is about 48 feet. Mrs. McCall, driving her husband's car with two small children in the front seat, was proceeding north on the

the paved portion of Rhode Island Avenue; the truck was proceeding west on Greenbelt Road approaching from her right.

Mrs. McCall testified that she was returning to her home at the time of the accident, about 11:15 A.M. on a clear day. She brought her car to a full stop and looked to her right but saw no vehicles approaching for "a good safe distance". Greenbelt Road is perfectly straight for a distance of about 1000 feet to the east, to the crest of a hill. She did not see the truck, but testified it was not within a distance of "one or two blocks", 300 or 600 feet.

She then started across, watching a bus that had stopped off the travelled portion of Greenbelt Road near the northeast corner. She did not look to her right again or see the truck until the moment of collision, when the front of her car had moved into the sixth or most northerly traffic lane. Her right fender struck the left fender of the truck. She testified that there was a stop sign on the northeast corner of the intersection, against traffic moving south on Rhode Island Avenue, but that there was no stop sign on the southeast corner against traffic moving north. She also testified that there had never been a stop sign there during the two years she had lived in the neighborhood.

Officer Vincent of the county police testified that he came to the scene shortly after the accident and found the truck overturned at the curb near the northwest corner with the McCall car beside it. He observed a solid skid mark for a distance of 96 feet from the wheels of the truck. He ascertained the point of impact from debris and broken glass. The skidmarks began about 20 feet beyond the point of impact. He testified that there was no stop sign on the southeast corner, although he stated that there were stop signs on both sides of Greenbelt Road at all other intersections except the Washington Boulevard a mile or more to the east. He could not say whether there had been a stop sign on the southeast corner prior to the day of the accident.

There were no stop signs against vehicles proceeding on Greenbelt Road. The speed limit in that zone was 30 miles per hour.

Houlihan, the driver of the truck, testified when called by the defendants that he was from 125 to 150 feet from the intersection when he saw the McCall car stopped at the southeast corner. He was driving at about 25 miles per hour. He saw the car start slowly across but thought it would stop before crossing the center marked by two white lines. He was then in the third lane from the center. The truck was loaded and weighed between 7 and 8 tons. It had been driven less than 2000 miles and the brakes were in good condition. When he was 40 or 50 feet from the other car he realized it was not going to stop. He applied his brakes but could not avoid the collision. Smith, a witness for the plaintiff who had worked for the appellant corporation until discharged for drinking, testified that the brakes on this truck were "bad" and he had so advised the manager two days before the accident; that it stood on the floor to be taken to Baltimore for adjustments until the day of the accident.

The plaintiff put in evidence without objection a table showing that an automobile of the usual type, at a speed of 30 miles per hour, can be stopped in a distance of 62 feet after brakes are applied. "Reaction time" was listed at 21 feet. It was admitted that a loaded truck, not equipped with air brakes, could not be stopped in 62 feet.

The plaintiffs put in evidence over objection a certified copy of Houlihan's driving record obtained from the Commissioner of Motor Vehicles. This showed, among other less serious offenses, two convictions for reckless driving in 1944 and 1946 and a conviction for exceeding 50 miles per hour on November 4, 1948, for which he was fined $10 and costs by a magistrate and subsequently reprimanded by the Commissioner. The court instructed the jury to disregard a conviction for exceeding 30 miles per hour subsequent to the date of the accident.

The appellants contend that the trial court erred in refusing to grant a demurrer prayer based on a lack of evidence of primary negligence on the part of the driver, and in refusing to instruct the jury that Greenbelt Road was a through highway or boulevard within the meaning of the Maryland Statute. The court said: "You will recall that the evidence in the case indicates that there was no stop sign facing Mrs. McCall as she approached the intersection with Greenbelt Road although there was one on the other side of the same intersection, and that there was no stop sign facing the driver of the truck, Mr. Houlihan, as he approached the same intersection from Mrs. McCall's right. Under those circumstances, neither of the roads can be defined, as a matter of law, as a favored or through highway." It charged the jury, in effect, that since Mrs. McCall was the first to reach the intersection and saw no vehicles within a safe distance, she had the right of way.

Section 2(59), Article 66½ of the Code, (1947 Supp.), defines "Through Highway" as "Every highway or portion thereof at the entrances to which vehicular traffic from intersecting highways is required to stop and yield right-of-way before entering or crossing the same and when stop signs are erected as provided in this Article." Section 178 provides: "(a) The driver of a vehicle shall come to a full stop as required by this Article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway.

"(b) The driver of a vehicle shall likewise come to a full stop in obedience to a stop sign and yield the right of way to a vehicle approaching on the intersecting highway as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway". Section 138 provides that "The State Roads Commission shall place and maintain, upon all highways under its jurisdiction, such traffic-control devices, conforming to its manual and specifications, as it shall deem necessary * * *".

Section 187(a) provides: "The State Roads Commission with reference to State and county highways * * * may designate through highways and erect stop signs at specified entrances thereto or may designate any intersection as a stop intersection and erect like signs at one or more entrances to such intersection."

We think it is clear that the erection of signs by the proper authorities is a necessary prerequisite to the creation of a through highway or stop intersection. While it is difficult to understand just why this particular corner should have been omitted when stop signs were erected at all other intersections in the vicinity and on the northwest corner of the intersection in question, it is undisputed that there was no stop sign at the southeast corner against Mrs. McCall. In the absence of evidence that a stop sign had ever been erected there, we think the court correctly ruled that the boulevard stop law did not apply.

The appellants contend that it appears from one of the photographs taken a few days after the accident that there is a leaning post near the southeast corner of a type ordinarily used to support a stop sign. They suggest that the sign may have been removed by unauthorized persons or knocked off in a previous accident. We can draw no such inference from the photograph. There is no testimony that a sign was ever erected there. The appellants contend that they were prevented by the court's rulings from proving that Greenbelt Road was "a favored highway", or a "boulevard". They asked Officer Vincent those questions and also whether there would "normally be a stop sign at that intersection". The court properly sustained objections to these questions. It was not shown that the witness had any official duties in connection with stop signs, and the questions called for an expression of opinion. The appellants then produced E. Paul Smith, Resident Maintenance Engineer for the State Roads Commission, and asked him as to the "classification of that highway in the state system." He replied that it was "a primary road", presumably

one under the control of the State Roads Commission. Over objection, he was not allowed to give the classification of Rhode Island Avenue, and his statement that it was a county road was stricken out. We find no error in the rulings. The "classification" of Rhode Island Avenue had no bearing upon the question as to whether Greenbelt Road was a through highway. Curiously enough, he was asked no questions in regard to the erection of stop signs.

In the absence of evidence to show that the boulevard stop law applied in the instant case, we find no error in the refusal of the demurrer prayer. The case is governed by the rules laid down in *Legum v. Hough,* 192 Md. 1, 63 A. 2d 316, and cases there cited, rather than the rules summarized in *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537, and the cases there cited. It is unnecessary to elaborate the sharp distinction between the two lines of cases. Had it been shown that this was a "through highway" or "stop intersection" entirely different principles would apply.

The appellants next contend that the court erred in admitting into evidence the driving record of the individual defendant and examining him about it. The amended declarations, in addition to alleging negligence on the part of the driver in the course of his employment, also alleged negligence on the part of the employer in selecting or retaining a driver known to be incompetent and reckless. Demurrers to these declarations were overruled. Before the trial, agency was formally admitted by the defendants, upon demand of the plaintiffs. The appellants do not challenge the correctness of the rulings on demurrer. We may assume, without deciding, that allegations of distinct and separate negligent acts may be joined in one declaration. If the evidence is legally insufficient as to a distinct issue, it may be proper to direct a verdict as to it. Cf. *Pennsylvania R. Co. v. State, use of Brewer,* 188 Md. 646, 656, 53 A. 2d 562. But in the instant case when agency had been admitted it was quite unnecessary to pursue the alternative theory

in order to hold the corporate defendant. It was only necessary to prove negligence on the part of the driver. In the recent case of *Nesbit v. Cumberland Contracting Co.*, 196 Md. 36, 75 A. 2d 339, after reviewing the authorities, we held that it was prejudicial error to permit cross-examination of the plaintiff operator as to previous convictions for traffic offenses, because of the danger that the jury might draw the inadmissible inference that because the plaintiff had been negligent on other occasions he was negligent at the time of the accident. The same danger was present in the instant case.

The appellees rely upon the case of *Rounds v. Phillips*, 166 Md. 151, 170 A. 532 (where the case was on demurrer) and 168 Md. 120, 177 A. 174 (where the appeal was from a directed verdict for the defendants). The suit was against parents who permitted their minor son to use for his own purposes an automobile titled in the name of the mother, with knowledge that the son was habitually reckless and addicted to alcohol. The court adopted and applied the rule formulated in the Restatement, Torts, § 390, that "one who supplies directly or through a third person a chattel for the use of another whom the supplier knows or from facts known to him should know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them." Under comment (b) it is stated that the rule is applicable "irrespective of whether the chattel is to be used for the supplier's purposes or for the purpose of him to whom it is supplied." The court said, however, 166 Md. 151, 166, 167, 170 A. 538: "of course, there are, and must be, limitations upon the application of the rule".

In discussing the fact that knowledge of a serious accident in 1929 had not been brought home to the defendants, the court said, 168 Md. 120, 126, 177 A. 176: "But

admittedly both of the defendants knew of the revocation, in May, 1932, of their son's license to operate an automobile, and with that knowledge they apparently made no effort to exercise their parental right to ascertain and determine whether he could be safely intrusted with a renewal of that privilege. To be wholly indifferent to such a serious problem is hardly consistent with the responsibility involved in a parent's authority. The fact that his license was renewed, after the required insurance was provided, is not a sufficient ground for relieving the defendants of their duty to restrict their son in the use of the automobile to the extent to which such control might be necessary in the interest of his own and the public safety. The revocation of his license because of intoxication when driving an automobile was a fact which would naturally prompt an investigation by the defendants as to the habits of their son affecting his qualifications as the driver of a car. If such a course had been pursued, in the proper directions, the defendants would undoubtedly have learned the additional and regrettable facts, proved in this case, as to their son's recklessness in the operation of his car on the public highways. It is therefore inferable that the defendants, from the facts known to them, should have become apprised of the 'unreasonable risk of bodily harm to himself and others' involved in their son's use of an automobile without restraint."

It is significant that in the *Rounds* case the plaintiff offered in evidence a certified copy of the son's driving record on file with the Commissioner of Motor Vehicles. Upon objection, the trial court excluded it, and this formed the basis of exception 2 in the record. The ruling was affirmed on appeal. Recovery was predicated upon knowledge brought home to the parents of the revocation of his license for drunken driving, its conditional renewal, and abundant testimony as to his subsequent reckless driving habits which, as parents, they were under a duty to control.

In the instant case there was no evidence that the corporate defendant knew Houlihan's driving record at the time of his employment in June, 1947. It was shown that before his employment he had a period of training with another driver to familiarize him with the route, that he had both a chauffeur's license and a pilot's license, and had driven trucks since 1944, both before and during his serive in the navy. While his driving record could doubtless have been obtained by the employer, there is no statutory duty imposed upon prospective employer to do so, and we think the employer was not charged with constructive notice of it.

When called by the plaintiffs, Houlihan admitted that on November 4, 1948 he was convicted of exceeding fifty miles per hour in one of his employer's trucks, failing to drive in the designated lane, and failing to have his chauffeur's license in his possession. The court declined to strike out his answer. He also testified that he told the plant manager about these convictions. The answer might have some probative force as one of a chain of circumstances tending to prove a habit of recklessness known to the employer, although it was irrelevant to establish negligence at the time of the accident. Where a driver's known incompetence is in issue, the exclusionary rule must yield, no doubt, to the necessity of permitting proof of previous misconduct. But where agency is admitted it can serve no purpose except to inflame the jury. Under the circumstances, we think it was error to admit the driving record, as expressly held in the *Rounds* case, and error to permit the plaintiffs to examine the driver in regard to previous convictions, which had no relevance to the only issue remaining in the case.

The appellees contend that the rulings were not prejudicial. It is true that the driving record disclosed that Houlihan had never been involved in an accident, except a minor one in 1944, but its admission had a natural tendency to exaggerate the importance of the offenses mentioned, and to disclose the actions taken

by the Commissioner of Motor Vehicles subsequent to or even independent of the convictions. The jury was not cautioned that it could not consider this evidence as bearing upon his negligence *vel non* at the time of the accident. On the contrary, the court told the jury they might "consider that portion of the evidence which indicates that the driver * * * had been involved in several infractions of the traffic laws before the happening of the accident, and such portions of the evidence as indicate that the employer * * * had knowledge of his driving record within a time which might enable it to replace him by some other driver, if you find that they had prior knowledge of that record." There was, of course, no evidence of such knowledge.

For the errors indicated we shall reverse the judgments and award a new trial.

*Judgments reversed, with costs, and new trial awarded.*