**David K. FESLER, Plaintiff,**

v.

**WHELEN ENGINEERING COMPANY, INC.,
Defendant.**

**No. 3:09–cv–00167 RP–TJS.**

United States District Court,
S.D. Iowa,
Davenport Division.

July 5, 2011.

---

sider the gun's color as probative evidence as to whom it belonged.

Robert Eugene Breckenridge, II, Kenneth A. Duker, Breckenridge & Duker, PC, Ottumwa, IA, for Plaintiff.

Gabriel J. Jiran, Shipman & Goodwin LLP, Hartford, CT, Leonard T. Strand, Simmons Perrine Moyer, Bergman PLC, Cedar Rapids, IA, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is a Motion for Summary Judgment, filed on February 22, 2011 by Whelen Engineering Company, Inc. ("Defendant" or "Whelen"). Clerk's No. 36. David K. Fesler ("Plaintiff" or "Fesler") filed a resistance to the Motion on March 22, 2011. Clerk's No. 43. Defendant filed a Reply on March 31, 2011. Clerk's No. 48. A hearing was held on June 22, 2011. Clerk's No. 59. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Defendant is a manufacturing company headquartered in Chester, Connecticut, with plants in both Connecticut and New Hampshire. Def.'s Statement of Material Facts (hereinafter "Def.'s Facts") ¶ 1. In approximately November 1980, Plaintiff became a sales representative [1] for Defendant following an oral conversation with Defendant's president, John Olson ("Olson").[2] *Id.* ¶ 2. Though there was no contract, agreement, or other documentation commemorating the relationship,[3] Plaintiff claims that Olson agreed to two specific "demands": 1) "that it was to be a 'real' job"; and 2) "I wanted to be told immediately if I did something wrong or something they didn't like. I did not want to be told of some shortcoming six months later or even 6 days later."[4] Pl.'s Resp. to Def.'s Facts ¶ 2; Pl.'s App. at 1 (Fesler Aff. ¶ 3); Pl.'s Statement of Add'l Material Facts (hereinafter "Pl.'s Facts") ¶ 3.[5] At no time during this meeting, or at any other point in the parties' relationship, did Olson

---

1. The parties and documents in this case variously characterize Plaintiff's role with Defendant as sales representative, regional sales manager, and authorized managing sales representative.

2. According to Plaintiff, "Whelen had a number of divisions within its corporate structure." Pl.'s Br. at 3. Plaintiff, however, worked primarily in Whelen's automotive and outdoor warning divisions. *Id.* The automotive division specializes in products such as light bars and other warning devices for emergency vehicles, while the outdoor warning division specializes in sirens and other methods of mass notification. *Id.* Specifically, Plaintiff was tasked with "the promotion of [Defendant's] products includ[ing] establishing a network of distributors to sell the product and on occasion [selling] directly to the consumer." *Id.*

3. Plaintiff claims that, at some point during his relationship with Whelen, a "contract" was handed out that called the sales representatives "independent contractors" and explained the legal meaning of that term. Pl.'s Statement of Add'l Material Facts ¶ 35. According to Plaintiff, "[n]o one wanted to sign the contract without talking to an attorney. The document was collected and never seen again." *Id.*

4. Defendant denies that Olson agreed to any such conditions. *See* Def.'s Resp. to Pl.'s Statement of Add'l Material Facts ¶ 3.

5. Defendant filed a Motion to Strike Plaintiff's Statement of Additional Facts (Clerk's No. 50) as that document was originally filed. *See* Clerk's No. 43.2. In response to Defendant's Motion to Strike, Plaintiff filed a substitute Statement of Additional Facts. *See* Clerk's No. 52.1. Defendant responded to the substitute Statement of Additional Facts. Clerk's

or any other representative of Defendant refer to Plaintiff as an "employee." Def.'s Facts ¶ 3. Likewise, Plaintiff never made any representations to anyone at Whelen or to anyone he dealt with in his capacity as a sales representative that he was an "employee" of Defendant.[6] *Id.*

When Plaintiff commenced his relationship with Defendant, he received very little information about his responsibilities. *Id.* ¶ 4. He was assigned a territory that covered several states, including Iowa, but was not provided any training on how to operate in that territory.[7] *Id.* Plaintiff was charged with the general task of promoting Whelen products and generating sales in his assigned territory.[8] *Id.* ¶ 5. Other than informing Plaintiff that he would be paid on a commission basis, the terms of Plaintiff's payment were not described to him; rather, Plaintiff learned the nature of the commission structure from other sales representatives.[9] *Id.* ¶ 6. Though Plaintiff occasionally received certain "override" funds from Whelen to cover office personnel or additional employees, Plaintiff *only* received compensation from Defendant in the form of commissions. *Id.* ¶ 7. Plaintiff received an IRS Form 1099 from Defendant for every year of his relationship with Defendant. *Id.*

In 1985, Plaintiff received a document entitled "Company Policies and Regulations for Automotive/Industrial Field Sales Representatives" (the "1985 Document") that outlined policies and procedures applicable to sales representatives. *Id.* ¶ 8. After stating that "[r]evisions will be made from time to time with 90 day notice," the first paragraph of the 1985 Document provides:

> Whelen Engineering Company appoints Regional Sales Managers on a *non-exclusive* basis[10] to certain territories and

---

No. 55. Accordingly, the Motion to Strike is denied as moot.

**6.** Plaintiff qualifies his admission of this fact by noting that "[n]o one ever referred to themselves as employee or independent contractor. Instead they were referred to as part of Whelen...." Pl.'s Resp. to Def.'s Facts ¶ 3.

**7.** Plaintiff alleges that he had worked in the same territory selling Defendant's products for his father, a Whelen distributor, so he needed no immediate instruction. Pl.'s Resp. to Def.'s Facts ¶ 4. Plaintiff further claims that Howard Berke ("Berke"), a representative of Defendant, provided on-site training on at least two occasions. *Id.* Regarding this latter assertion, Plaintiff cites to pages 1 and 6 of his Appendix. These pages comprise part of a fourteen-page, 42–paragraph affidavit that Plaintiff prepared in response to Defendant's Motion for Summary Judgment. *See* Pl.'s App. at 1–14. Neither of these pages, however, nor any other portion of Plaintiff's Affidavit, supports Plaintiff's assertion that Berke ever provided "on-site training." Indeed, Plaintiff's references to Berke throughout his affidavit recount only generalized contacts. *See, e.g.,* Fesler Aff. ¶ 6 (Berke stated that sales representatives were "part of Whelen"); ¶ 7 (Berke informed Plaintiff that he was to move his office location); ¶ 13 (Berke told Plaintiff to hire an additional person to assist with his territory); ¶ 17 (Berke told Plaintiff he should set up a separate corporation); ¶ 19 (Berke met Plaintiff in Cedar Rapids and drove with him to Minnesota to meet with the "Minnesota DOT"); ¶ 20 (Plaintiff met with Berke regarding territory realignment); 21 (Berke talked with Plaintiff and reassigned him to the outdoor warning products division).

**8.** Before Plaintiff was assigned to the territory, there was no Whelen representation in the area. Pl.'s Facts ¶ 2. In the early years of Plaintiff's relationship with Defendant, he engaged in direct sales from Whelen to the customer. *Id.* ¶ 5. Later, as more and more distributors were added, sales to customer were done through a Whelen distributorship network. *Id.*

**9.** Plaintiff's initial commission was set at 9% of the sales in his territory. Def.'s Facts ¶ 6.

**10.** A later provision in the 1985 Document provides that representatives "will not sell

product lines as deemed in the company's best interest. These Sales Managers, to be called Representatives herein, are hired as independent contractors, not as employees. They shall represent those product lines of the Whelen Engineering Company that are mutually agreed to by the individual product line sales managers and the Representative. Pl.'s App. at 56. The 1985 Document also outlined the commission structure, and provided that sales representatives "shall pay for their own expenses, insurances, transportation and other travel or living expenditures," and are "responsible for arranging for payment of their own taxes, workman's compensation or any retirement or profit sharing plans as they deem necessary." *Id.* Moreover, the 1985 Document contained numerous requirements applicable to sales representatives, including among other things, that they attend Annual Sales Managers Meetings, visit the Whelen factory at least one other time during the calendar year, reply to forwarded leads within 30 days, contact the factory at least once per day,[11] respond to messages from Whelen immediately, maintain a separate Whelen phone number, and assist in collection problems and in updating certain lists. *Id.* at 54–62. Regarding termination, the 1985 Document provided:

> 4. If in the opinion of the management of Whelen Engineering Company, a review of the Representative's performance indicates that sales volume, goals, territory coverage, customer contact, or product line involvement is not satisfactory, then the management may elect to implement "notice" or "termination" procedures on some or all of these areas being covered. If such steps are taken, they will follow procedures outlined in Paragraph 37.
>
> . . .
>
> 37. Whelen Engineering company reserves the right to terminate portions of territories or individual product lines of a given Representative. Every effort will be made to provide prior warnings of a representative's failings. If in the opinion of the Management of Whelen Engineering Company a Representative has not met general goals as detailed in paragraph 4, such Representatives will be put on "notice", i.e., probationary period of up to 6 months that mandates improved performance. At the end of this time period, if revised targets and goals are not met, then the Company will, at its option, either aggressively look for a replacement Representative or may elect to notify the Representative of termination.[12]

*Id.* at 56–57, 62.

In September 1987, Plaintiff received a letter from Whelen's Vice President, Charles Phelps ("Phelps"), informing him that sales representatives promoting auto-

---

other lines of equipment or services unless specifically agreed upon and authorized in advance by the Management of Whelen Engineering Company." Pl.'s App. at 59.

**11.** Plaintiff contends that his failure to maintain daily contact with Whelen was met with repeated criticisms. Pl.'s Facts ¶ 22. Defendant counters that, though daily contact was required in the policies, that requirement was not enforced. Def.'s Resp. to Pl.'s Facts ¶ 22. Indeed, Plaintiff's citations in support of his assertion indicate merely that Defendant, at some times, was upset that Plaintiff was not

sufficiently easy to reach or prompt in returning phone calls. They do not reflect that Plaintiff was criticized for failing to call the factory every day.

**12.** Plaintiff testified at deposition that he did not consider the 1985 Document to be a contract. Def.'s Facts ¶ 13. In his subsequent Affidavit, Plaintiff modified his testimony to state that he did not know if the 1985 Contract, or any other relevant document was a "contract," as that issue was a legal one for the Court to decide. *See* Def.'s App. at 13–14 (Fesler Aff. ¶ 42).

motive and industrial sales, such as Plaintiff, would no longer be promoting the outdoor warning line of products. Def.'s Facts ¶ 14. Plaintiff has testified that this letter essentially "fired" him from his position as an automotive and industrial sales representative, but that Phelps subsequently approved Plaintiff as a representative for Whelen's outdoor warning line of products. *See id.* ¶ 15; Pl.'s Resp. to Def.'s Facts ¶ 15; Pl.'s App. at 7 (Fesler Aff. ¶ 22). Plaintiff also continued to promote automotive products, despite Phelps' letter.[13] Def.'s Facts ¶ 15. In April 1994, however, Whelen Vice President Howard Berke ("Berke") sent Plaintiff a letter terminating him, without any sort of probationary period, from representation of Whelen's automotive products, effective May 31, 1994. *Id.* ¶ 18. Thereafter, Plaintiff continued to represent only Whelen's outdoor warning line of products. *Id.* Whelen Vice President Phil Kurze ("Kurze") oversaw Plaintiff in this position.[14]

In September 1994, Plaintiff received a document entitled "Regional Sales Manager Policy" (the "1994 Policy") that was applicable to Plaintiff's role as a representative for Whelen's outdoor warning product line. *Id.* ¶ 20. Like the 1985 Document, the 1994 Policy states in the very first section that "Whelen Engineering appoints Regional Sales Managers on a non-exclusive basis" and that "Sales Managers (or Representatives) are hired as independent contractors, not as employees."[15] Pl.'s App. at 82. Also like the 1985 Document, the 1994 Policy stated that Regional Sales Managers were responsible for their own expenses, would be paid on a commission basis, and were subject to certain requirements and restrictions, such as visiting Whelen's plant, maintaining communication, and obtaining approval before selling competing products. *See generally* Pl.'s App. at 82–87. The final section of the 1994 Policy provided:

I.p. TERMINATION

*I.p.1* Whelen Engineering reserves the right to terminate portions of territories or individual product lines of a given Regional Sales Manager.

*I.p.2* Every effort will be made to provide warnings of a Sales Managers's failings.

---

13. The parties point out that in 1993, Plaintiff attended an annual sales meeting where he received a copy of the meeting's agenda. Def.'s Facts ¶ 16. The 1993 Agenda reiterated many of the same provisions that appeared in the 1985 Document, and like the 1985 Document, identified Plaintiff and other sales representatives as independent contractors rather than as employees. *Id.*

14. Plaintiff contends that either Kurze or Tom Ellison was his "direct supervisor." Pl.'s Resp. to Def.'s Facts ¶ 19. He does not, however, provide any citation to the record in support of this proposition. *See* L.R. 56(b) ("A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.").

15. Plaintiff claims "when the personal [sic] policy manuals came out and the first paragraph immediately referred to independent contractors, David spoke to John Olson and was assured that the written manuals were created to centralize the location of written policies and to give the representatives job security." Pl.'s Facts ¶ 34. Defendant admits that a conversation between Plaintiff and Olson occurred regarding the purpose of the policies, but denies that "the discussion related to employment of the sales representatives, as the policies themselves are very clear that the sales representatives were independent contractors." Def.'s Resp. to Pl.'s Facts ¶ 34.

*I.p.3* If, in the opinion of the Management of Whelen Engineering Company, a Regional Sales Manager has not met general goals as detailed, such Regional Sales Manager may be put on "notice" (i.e. probationary period) up to 6 months that mandates improved performance. At the end of the time period, if revised targets and goals are not met, then the Company will, at its option, either aggressively look for a replacement Regional Sales Manager or may elect to notify the Regional Sales Manager of termination.

*I.p.4* If termination is opted, commission payout will continue on any order booked before the effective date and invoiced subsequently.

*I.p.5* If it is found that the Regional Sales Manager has sold or converted a customer to buy a competitors [sic] product, it is grounds for immediate termination.

*I.p.6* Conduct that could harm the reputation of the company could also be grounds for immediate termination.

Pl.'s App. at 87. A policy very similar to the 1994 Policy was distributed in 1995 (the "1995 Policy"). The 1995 Policy was virtually identical to the 1994 Policy, including in its "termination" section; however, the 1995 Policy substituted the term "Authorized Managing Sales Representative" for the term "Regional Sales Manager."[16] Def.'s Facts ¶ 21; Pl.'s App. at 88–94.

In a telephone conversation on July 11, 2007, Kurze informed Plaintiff that the relationship between Whelen and Plaintiff would terminate effective July 31, 2007. Def.'s Facts ¶ 23. Kurze made no mention of Plaintiff's performance in this conversation; rather, he told Plaintiff that Whelen was "going in a different direction" and Plaintiff "did not fit into that new direction." *Id.* Kurze sent Plaintiff a follow-up letter dated the same day, stating that Plaintiff's "services as an independent Authorized Managing Sales Representative (AMSR) for [Whelen] will be terminated at the end of business on Tuesday, July 31, 2007," articulating that commissions would be paid on sales booked before the termination date, and noting, "[a]s you are aware, an AMSR is an independent representative and not an employee of Whelen Engineering Company, Inc." Pl.'s App. at 131; Def.'s Facts ¶¶ 24, 27. Also on July 11, 2007, Plaintiff sent an e-mail to a Whelen distributor to inform it that Plaintiff

---

**16.** According to Defendant, the 1994 and 1995 Policies were only "guidelines" and "many of the provisions were either not enforced or evolved informally over time." Def.'s Facts ¶ 22. Plaintiff denies this assertion, citing several pages of his Appendix in support of his claim that the "record contains multiple examples of the enforcement of such provisions." Pl.'s Resp. to Def.'s Facts ¶ 22. Upon review, however, the cited Appendix pages do not support Plaintiff's denial. *See supra* n. 13 (citing L.R. 56(b)). For instance, Plaintiff cites the deposition testimony of Thomas Ellison, presumably to show that Defendant enforced the 1985 Document's requirement that "all Representatives are required to contact the factory IMMEDIATELY if a message is left by any Whelen employee." *See* Pl.'s App. at 49. Ellison, however, merely testified that he talked to Plaintiff around twice per week, that it was "difficult" to contact Plaintiff because Plaintiff usually took four to five hours to return Ellison's call, and that he would have "hop[ed] for" a response time of about one hour. *Id.* at 60. Similarly, Plaintiff points to an e-mail he received from Kurze noting that Kurze had "not received an activity report" from Plaintiff that week. *Id.* at 127. The apparent "policy" requiring such a report, however, appears to come from a 2006 Meeting Agenda that noted Whelen would "be requesting that each of you provide me with an activity calendar of your efforts." *Id.* at 123. The right not to be terminated without notice that Plaintiff asserts, however, is premised, according to Plaintiff's Complaint, on either the 1985 Document, or the 1994 or 1995 Policies, *not* on the 2006 Meeting Agenda.

could not honor certain pricing commitments and that future pricing would need to be discussed with Whelen. Def.'s Facts ¶ 26. In this e-mail, Plaintiff specifically stated: "As you and I have talked; I am an independent rep for Whelen known as an AMSR." *Id.*

A memorandum from Kurze to Olson dated July 12, 2007 detailed numerous failings in Plaintiff's performance with Defendant, including among other things, falling asleep at meetings, having a learning disability, not getting along with co-workers, excessive alcohol use, lack of knowledge of products, and declining territory sales. Pl.'s Facts ¶ 37; Pl.'s App. at 132–35. Plaintiff contends that his shortcomings were never addressed prior to his termination and that he was not given an opportunity to correct such "failures"; however, the record shows that Whelen raised numerous performance problems with Plaintiff at various times prior to his termination. *See, e.g.,* Pl.'s App. at 97 (fax cover sheet from Kurze to Plaintiff dated March 12, 1998 referencing poor sales and failure to notify of action taken on sales leads), 99 (fax cover sheet from Kurze to Plaintiff dated July 21, 1998 regarding insufficiently detailed reports and failure to provide updated distributor list), 102 (email from Kurze to Plaintiff dated February 21, 2001 regarding failure to notify of action taken on sales leads), 103 (email from Kurze to Plaintiff dated February 27, 2001 detailing insufficient communication and other problems), 105 (email from Kurze to Plaintiff dated July 2, 2001 regarding failure to notify of action taken on sales leads); 107 (email from Kurze to Plaintiff dated December 19, 2001 regarding poor communication), 109 (email from Kurze to Plaintiff dated January 10, 2003 regarding Plaintiff's lack of knowledge of what is happening in his territory); 113 (email from Kurze to Plaintiff dated August 29, 2003 regarding keeping in adequate communication). Regardless, there is no real dispute that Plaintiff was not formally placed on "notice" or provided a probationary period prior to his termination.

During the course of the parties' relationship, Plaintiff operated his own independent office and ran his own budget.[17] Def.'s Facts ¶ 29. From approximately 1980 through 1988, Plaintiff deposited checks from Whelen into an account for Dan R. Fesler & Son, Inc. which, in turn, provided Plaintiff a paycheck, with all tax withholdings, unemployment, and workers' compensation premiums made by Dan R. Fesler & Son, Inc. *Id.* ¶ 47. In 1988, Plaintiff created a new corporation named David Kimm Fesler, LTD,[18] and thereafter deposited checks from Whelen into that corporation's account and paid himself a salary from that corporation.[19] *Id.* ¶ 48.

---

17. Plaintiff emphasizes, however, that he operated his business in accordance with the directives and directions of Whelen and had numerous demands placed on him by Whelen. Pl.'s Resp. to Def.'s Facts ¶ 29.

18. Plaintiff asserts he created this new corporation at the direction of Berke. Pl.'s Resp. to Def.'s Facts ¶ 48.

19. Plaintiff claims that he was "cautioned that this would be a company that would be set up for the sole purpose of promoting Whelen products and that if he would ever be terminated or stop representing Whelen that

he could not transfer ownership of that company to anyone." Pl.'s Facts ¶ 18. Defendant partially denies and partially admits this assertion. Specifically, Defendant "admits that it does not allow a transfer of the representation of Whelen products by sales representatives." Def.'s Resp. to Pl.'s Facts ¶ 18. Defendant, however, "denies that Mr. Fesler was an employee, and denies that it directed Mr. Fesler to set up his own corporation for the sole purpose of promoting Whelen products." *Id.* Defendant further points out that Plaintiff was "able to represent other products provided they did not compete with Whelen products." *Id.*

Even after Plaintiff's relationship with Defendant ended, Plaintiff continued to receive paychecks from David Kimm Fesler, LTD. *Id.* ¶ 49. When his relationship with Whelen ended, Plaintiff did not file for unemployment benefits because he owned his own company. *Id.* ¶ 50.

Plaintiff was able to hire individuals to work for him in his office.[20] *Id.* ¶ 42. Such persons were employees of Plaintiff's own company, not of Whelen, and Plaintiff was responsible for paying them and making appropriate tax withholdings, though Whelen sometimes gave Plaintiff an additional commission percentage to cover expenses related to Plaintiff's employees. *Id.* ¶ 44. Plaintiff was able, subject to a limitation that the office could not be located on the premises of a Whelen distributorship, to choose the location of his office.[21] *Id.* ¶ 30. Plaintiff was responsible for setting up his own office and paying for his own supplies, though Whelen occasion-ally provided "additional payment called overrides to m[eet] certain Whelen directives." *Id.* ¶ 30; Pl.'s Resp. to Def.'s Facts ¶ 30. Plaintiff generated his own travel budget, and was expected to cover all of his own travel expenses incurred in promoting Whelen products.[22] Def.'s Facts ¶ 45. Plaintiff determined his own travel schedule and how to operate within his own territory, though he had to provide a weekly schedule to Whelen and would "occasionally be redirected by Whelen." [23] Def.'s Facts ¶ 34; Pl.'s Resp. to Def.'s Facts ¶ 34. Plaintiff was able to control his budget by deciding to split commissions with other distributors, and did not require Whelen's approval to do so. Def.'s Facts ¶ 46. Plaintiff's address, phone number, fax number, and email address were published on Whelen sales literature, though such literature did not identify Plaintiff as an independent contractor. Pl.'s Facts ¶ 11. Plaintiff's answering machine message stated that the "caller had

20. While Plaintiff's hiring of such employees "may have been discussed with Whelen representatives, [ ] any approval process was minimal or non-existent." Def.'s Facts ¶ 42. For instance, Whelen "may have verified that the employee did not have a criminal background so that Whelen did not have a representative calling on police department customers who had a criminal history." *Id.* ¶ 43. Plaintiff points out, however, that on two occasions, Whelen directed him to employ additional personnel to assist him. Pl.'s Resp. to Def.'s Facts ¶ 42.

21. Plaintiff contends that Whelen had "direct input on the location of the office and made [him] relocate on two different occasions." Pl.'s Resp. to Def.'s Facts ¶ 30. Specifically, Plaintiff contends that after purchasing his father's business, Dan R. Fesler & Son, Inc. (a Whelen distributorship), he located his Whelen Regional Office inside the Dan R. Fesler & Son, Inc. location. Pl.'s App. at 2 (Fesler Aff. ¶ 7). Berke told Plaintiff he would have to move the office, presumably because of the restriction on locating offices inside Whelen distributorships. *See id.*; Def.'s Facts ¶ 30. Plaintiff thereafter moved his office to his

home, but was told by Berke around five years later that he would need to move the office out of his residence. Pl.'s App. at 3–4 (Fesler Aff. ¶ 7). Plaintiff then purchased a separate location of his own choosing to maintain his office. *Id.* at 4.

22. Defendant did, however, cover the costs of lodging and group meals when Plaintiff attended sales meetings or trade shows. Def.'s Facts ¶ 45.

23. Plaintiff's schedule was somewhat restricted when he used Whelen's airplane. Def.'s Facts ¶ 34. As early as 1993, Plaintiff was requested to provide weekly reports of his activities within his territory and sales projections. *See* Def.'s Facts ¶ 39; Pl.'s Resp. to Def.'s Facts ¶ 39; Pl.'s Facts ¶ 21. Plaintiff points out that the weekly reports "demanded specific details," but he does not deny Defendant's asserted fact that Plaintiff provided the requested reports "infrequently" or that when he did provide the reports, "he only gave very vague descriptions of his activities." *See* Def.'s Facts ¶ 39; Pl.'s Resp. to Def.'s Facts ¶ 39.

reached the office of David Fesler, RM/AMSR of Whelen Engineering, and that their call was important and that if they would leave their name and phone number their call would be returned as soon as possible."[24] *Id.* ¶ 15.

Plaintiff was required to take factory tours or attend sales meetings once or twice a year.[25] Plaintiff could obtain sample products from Whelen; he had to pay for some, while others were provided at no cost. Def.'s Facts ¶ 33. Plaintiff's use of provided samples was subject to specific guidelines on how to use and dispose of such products. Pl.'s Facts ¶ 12. Defendant provided Plaintiff with templates for business cards and stationary, both of which identified Plaintiff's company as an authorized representative for Whelen.[26] Def.'s Facts ¶ 32. Whelen representatives responsible for overseeing Plaintiff's activities on Whelen's behalf only visited Plaintiff's territory three or four times during Plaintiff's 27 year relationship with Whelen, though Plaintiff was required to keep reasonable contact with Defendant about activity in his territory and was expected to promptly return phone calls from Whelen employees. *Id.* ¶¶ 38, 40. Additionally, Defendant provided Plaintiff with sales leads from a service called Bacon News Clippings. *Id.* ¶ 41. Though Defendant did not dictate how to respond to these leads, Plaintiff was expected to report back on what he had done with them. *Id.* Given that Defendant did not have a designated service provider, Plaintiff was also expected to address service concerns raised by customers. Pl.'s Facts ¶ 20.

Plaintiff filed suit against the Defendant on July 8, 2009 in the Iowa District Court in and for Johnson County, Iowa. Clerk's No. 1. Defendant removed the action to federal court on November 25, 2009. *Id.* On January 6, 2010, Plaintiff filed an Amended Complaint asserting one count of breach of contract against Defendant. Clerk's No. 12. Specifically, Plaintiff's Amended Complaint alleges that he was an employee of Defendant, that the 1985 Document and the 1994 and 1995 Policies created a unilateral contract of employment, and that Defendant breached that unilateral contract of employment by terminating

24. Plaintiff states that his answering machine and voice mail messages were "critiqued by Whelen." Pl.'s Facts ¶ 15. The Court is unsure what Plaintiff means by this, but it appears, based on Plaintiff's deposition testimony, that Defendant simply required that Plaintiff's outgoing message identify the number called as a "Whelen Engineering Regional Sales Office." *See* Pl.'s App. at 22.

25. Plaintiff claims that "[f]actory training was not limited to training on products and specific directives were given to attend specific events." Pl.'s Resp. to Def.'s Facts ¶ 37.

However, the citations Plaintiff provides in support of this assertion only show, at best, that he attended certain meetings, not that he was required to do so. *See id.* (citing Pl.'s App. at 75–77 (Agenda from a National Sales Meeting in September 1994); 95 (sexual harassment syllabus dated September 1996); 120–23 (Agenda for May 2006 National Sales Meeting)). Moreover, Whelen freely admits, and Whelen's policies provide, that Plaintiff was required to attend the company's annual sales meeting, and it appears that at least two of the three documents Plaintiff cites may well be from those required meetings, rather than from other "additional" meetings. As to the third meeting referenced in Plaintiff's citations, on sexual harassment, Defendant admits that it made this training available to sales representatives, but denies that it was mandatory. Def.'s Resp. to Pl.'s Facts ¶ 25.

Defendant admits that when Whelen registered Plaintiff for conferences or trade shows, the registration was made in Plaintiff's name under the name of Whelen, was paid for by Whelen, and that Plaintiff's name badge would show Plaintiff's name, title, and Whelen Engineering. Pl.'s Facts ¶ 14.

26. Plaintiff contends that Whelen actually provided the cards, stationary, and letterhead, not just templates. Pl.'s Resp. to Def.'s Facts ¶ 32.

Plaintiff without just cause and by failing to provide him with notice of substandard performance and an opportunity to cure. *See id.*

## II. STANDARD FOR SUMMARY JUDGMENT

■■■ The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[27] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[28] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate

---

**27.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**28.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for sum-

mary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)).

### III. LAW AND ANALYSIS

Defendant's Motion for Summary Judgment asserts that Plaintiff's claim for breach of contract fails for several reasons. First, Defendant argues that Plaintiff was an independent contractor, not an employee of Whelen. Second, Defendant contends that, even if Plaintiff was an employee of Whelen, his employment was at-will, as there was no contract governing the employment relationship. Finally, Defendant asserts that even if the 1985 Document or the 1994 or 1995 Policies were sufficient to constitute a unilateral contract of employment, there is no evidence that Defendant breached any provision of such

contracts. Plaintiff vehemently resists Defendant's arguments in all three regards. The Court will address each issue in turn.

### A. *Plaintiff's Classification as an Employee or an Independent Contractor*

■■ There is no dispute that all three documents Plaintiff points to as potentially constituting a contractual arrangement between the parties contain a provision designating Whelen sales representatives as "independent contractors." The Iowa Supreme Court has long characterized independent contractors as follows:

> "An independent contractor within the generally accepted legal definition of the terms is: A person who, in the pursuit of an independent business, undertakes to do specific work for another person, using his own means and methods without submitting himself to the control of such person in respect to all of its details. An independent contractor represents the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."

*Meredith Pub. Co. v. Iowa Employment Security Comm'n*, 232 Iowa 666, 6 N.W.2d 6, 10 (Iowa 1942) (quoting *Arne v. W. Silo Co.*, 214 Iowa 511, 242 N.W. 539, 542 (1932)). The mere fact, however, that Whelen designates its sales representatives as independent contractors is not determinative on the issue of whether such representatives are, in fact, independent contractors as opposed to employees. *See, e.g., Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 217 (Iowa 1984) (designation of worker as independent contractor not conclusive); *Louismet v. Bielema*, 457 N.W.2d 10, 13 (Iowa Ct.App.1990) ("If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial.").

■ "In cases presenting a choice between categorizing a person as an employee or an independent contractor, the primary focus is on the extent of control by the employer over the details of the alleged employee's work." *Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542 (Iowa 1997). Factors relevant to this consideration include: (1) who had the right to control the physical conduct of the work; (2) whether the purported employee was on the employer's payroll; (3) the method of payment, whether by time or by job; (4) who provided the equipment to accomplish the work; (5) the individual's obligation to furnish necessary tools, supplies, and materials; (6) the existence of a contract for the performance of a certain kind of work at a fixed price; (7) the independent nature of the individual's business; (8) the individual's employment of assistants, with the right to supervise their activities; (9) the time for which the individual is employed; (10) whether the work is part of the regular business of the employer; (11) the intent of the parties;[29]

---

**29.** Plaintiff argues that "the intent of the parties has very little to do with the issue of whether Fesler was or was not an employee" and that "[c]onsideration of the intent of the parties is generally used only in those cases involving a 'borrowed servant.'" Pl.'s Br. at 6. In support of this argument, Plaintiff points to a passage in *McCarthy* stating that the primary focus in determining whether a person is an employee or an independent contractor is the extent of control exerted over the person's work, while "in the context of a borrowed servant situation, the primary focus is on the intent of the parties." *McCarthy,* 572 N.W.2d at 542. Plaintiff's selective reading of *McCarthy*, however, ignores the following passage appearing a mere two sentences later: "It is important to note that even in those cases where the parties' intent is not the overriding or controlling consideration, it is still a factor to be considered." *Id.* (citing *D & C Express, Inc. v. Sperry*, 450 N.W.2d 842, 844 (Iowa 1990); *LaFleur v. LaFleur*, 452 N.W.2d 406, 408 (Iowa 1990); and *Peterson*, 391 N.W.2d at 237).

Plaintiff additionally argues that "Iowa cases alone do not provide a complete picture

and (12) the right to control the progress of the work, except as to final results. *Id.* at 542–43 (citing *Peterson v. Pittman,* 391 N.W.2d 235, 238 (Iowa 1986) and *Nelson v. Cities Serv. Oil Co.,* 259 Iowa 1209, 146 N.W.2d 261, 265 (1966)).

As to the first *McCarthy* factor, right to control the physical conduct of the work, it is clear that Plaintiff possessed largely unfettered discretion to perform his sales representative duties in the manner he saw fit. Plaintiff received little, if any, guidance from Defendant in how to go about his assigned task of promoting Defendant's products and generating sales in his assigned territory. While it is true that Defendant expected Plaintiff to maintain reasonable office hours and good communication, Plaintiff points to no particular evidence in the record tending to support a conclusion that Defendant exercised virtually any control as to *how* Plaintiff performed his sales representative duties. Accordingly, this factor weighs in favor of a finding of independent contractor status.

The second and third *McCarthy* factors also point towards a finding of independent contractor status. Plaintiff was not "on Defendant's payroll" and he was not paid by time. He did not receive a cyclical paycheck; rather he received payment in the form of commission checks based exclusively on sales generated. *See United States v. Porter,* 569 F.Supp.2d 862, 874 (S.D.Iowa 2008) ("While payment on a weekly basis generally indicates an employer-employee relationship, payment on straight commission suggests the worker is an independent contractor."). Defendant did not provide Plaintiff any "employee" benefits, nor did it withhold state and federal taxes, workers' compensation or social security from Plaintiff's commissions. *See D & C Express, Inc.,* 450 N.W.2d at 844 (finding the "withholding of federal income and social security taxes" is a relevant factor in determining whether relationship is employer/employee or independent contractor); *McGowan v. Brandt Const. Co.,* No. 09–1033, 2010 WL 2079704, at *10 (Iowa Ct.App. May 26, 2010) ("The employer's conduct in complying with federal tax laws is probative of the employer's intent to create an employer/employee relationship."). Indeed, Plaintiff received a 1099 IRS Tax form, not a W–2, for every

---

of what tests are used to determine what is an employee and what is an independent contractor." Pl.'s Br. at 8. Hence, Plaintiff urges the Court to employ the "broader and more universal standards for determining whether a worker is an employee or independent contractor [as] set forth in the United States Supreme Court case of *Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)." *Id.* *Darden,* however, applied general common law principles of agency in the context of an ERISA claim. *See Darden,* 503 U.S. at 318, 112 S.Ct. 1344. It did not apply Iowa law, which is the binding source of applicable law in the present case. Moreover, a closer look at the *Darden* factors reveal that they largely overlap with relevant factors employed by Iowa courts considering whether an individual is an employee or an independent contractor. *See Darden,* 503 U.S. at 323–24, 112 S.Ct. 1344 (" 'In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.' ") (quoting *Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

year of his relationship with Defendant, and deposited all funds received from Defendant into a corporate account (affiliated *only* with Plaintiff), which then "paid" Plaintiff a salary after deducting requisite workers' compensation, social security, and federal and state tax withholdings. Plaintiff was additionally able to split commissions with other sales representatives or distributors, without any input or restrictions by Defendant. While Defendant did provide Plaintiff with "override" payments to aid in covering certain costs, such as additional employees, these payments were reimbursements, not compensation. As such, the Court finds such payments do little to undermine a conclusion that Plaintiff was an independent contractor.

The fourth and fifth *McCarthy* factors, who provided the equipment to accomplish the work and the individual's obligation to furnish necessary tools, supplies, and materials, also weigh toward a finding of independent contractor status. While Plaintiff received some free samples to aid him in making sales of Defendant's products, he also had to purchase many of these samples. Moreover, to the extent that samples were free, there were specific guidelines imposed on how such samples were to be used and how Plaintiff was permitted to dispose of them. Additionally, Defendant did not provide office space, office staff, office equipment, a car, a phone, or any other materials for Plaintiff's use in promoting and selling Defendant's products. Rather, Plaintiff was wholly responsible for paying virtually all expenses related to his sales representative activities, including expenses related to office space, office supplies and equipment, insurance, transportation, and travel. Plaintiff was also ultimately responsible, regardless of any "overrides" payments provided by Defendant, to pay his own office staff, to provide any relevant benefits to them, and to make appropriate federal and state withholdings from his own staff's pay.

The sixth factor, the existence of a contract for the performance of a certain kind of work at a fixed price, also weighs against the finding of employee status. Plaintiff was hired through an oral conversation, and did not sign any contract, agreement, or other document related to his relationship with Defendant. Plaintiff did not receive compensation at an hourly rate for a fixed price; rather his compensation was contingent entirely on the results he obtained. If Plaintiff spent one hundred hours generating leads, but ultimately had no sales as a result, he received no compensation. *See LaFleur v. LaFleur*, 452 N.W.2d 406, 409 (Iowa 1990) (finding that when compensation is geared toward results and not to the amount of labor performed, it is indicative of an independent contractor rather than an employee). To the extent that Plaintiff contends the 1985 Document or the 1994 or 1995 Policies created a unilateral contract of employment, the Court rejects this contention in *infra* Section III.B.

 The seventh factor, the independent nature of Plaintiff's business, weighs toward a finding of independent contractor status. Plaintiff was responsible for setting up his own office, providing his own staff, and obtaining his own equipment and supplies. Subject only to minimal restrictions, Plaintiff was able to choose his own office location anywhere in his multi-state territory. Defendant, likewise, provided only nominal input on Plaintiff's selection of staff, and virtually no input on Plaintiff's selection of supplies or equipment. Plaintiff operated under two separate corporate structures controlled only by him, was able to perform sales tasks for other types of noncompeting products, was able to perform sales tasks for competing products with Defendant's approval, and generally was able to conduct his duties on behalf of Defendant in any manner he saw fit.

While Plaintiff points to Defendant's requirements that he keep in contact, return calls promptly, and attend certain training sessions as evidence that Defendant exerted an inordinate amount of control over him, such "control" by Defendant was nominal and consistent with Whelen's right to exert *some* supervision and/or guidelines over Plaintiff to ensure that the end result of the parties' relationship—sales—was achieved. Indeed, "every [agreement] for work to be done reserves to the employer a certain degree of control,—at least to enable him to see that the contract is performed according to the specifications." *Meredith Pub. Co.*, 6 N.W.2d at 10–11 (quotations and citations omitted). "A person employed to perform certain work is not necessarily a mere servant because the [parties' agreement] provides that the work shall be subject to the approval or satisfaction of the employer." *Id.*

The eighth *McCarthy* factor, Plaintiff's employment of assistants, with the right to supervise their activities, weighs against a finding that Plaintiff was Defendant's employee. In order to assist him in his territory, Plaintiff hired individuals to work for his own corporation.[30] Though Plaintiff points out that Defendant occasionally told him to hire additional staff, and may have discussed who was hired, Plaintiff points to no evidence in the record that anyone other that Plaintiff himself exercised any sort of supervisory control or authority over Plaintiff's employees. Likewise, Plaintiff points to no evidence that, despite occasionally discussing hiring matters with Defendant, anyone other than Plaintiff made any hiring, termination, compensation, or benefits decisions with regard to Plaintiff's staff.

The ninth and tenth factors arguably weigh in favor of employee status for Plaintiff. Plaintiff worked for Defendant, in one capacity or another, for approximately twenty-seven years. Likewise, Plaintiff's designated role as a sales person for Defendant's products can be considered part of the "regular" business of Whelen. The eleventh factor, intent of the parties, however, weighs strongly against employee status. In no less than three separate documents provided to Whelen's sales representatives, it was succinctly and obviously stated that such personnel are "independent contractors" and "not employees" Further, Plaintiff cannot identify a single occasion where either he or Defendant ever referred to any sales representative as an "employee" of Whelen. Indeed, in at least one e-mail, Plaintiff identifies himself to a client as an "independent representative" of Defendant. Moreover, Plaintiff did not file for unemployment

---

30. Plaintiff claims that Defendant "directed the hiring of additional personnel and would give approval to the hiring of the office staff." Pl.'s Facts ¶ 16. In support of this argument, Plaintiff cites a memorandum from Kurze to Olson stating that "it was going to be necessary for all AMSRs to provide a backup for them, in the event something happened to them, so someone else would be able to take over as well as help to cover the territory." Pl.'s App. at 133. In his deposition, however, Plaintiff stated that his hiring of additional personnel was necessitated by the fact that Plaintiff represented the largest sales territory of Defendant and there was concern that Plaintiff could not perform all the necessary work on his own. *See* Def.'s App. at 98. Indeed, while the record does reflect that Defendant told Plaintiff to get help in performing his duties, Plaintiff himself initiated several employee hires. Moreover, the extent of input Defendant had with regard to the functioning of Plaintiff's staff was virtually nonexistent, while Defendant's "oversight" as to who Plaintiff hired was limited to very general background questions. *See id.* (Plaintiff testifying at deposition that when he hired Lynn Schebblen, he merely told Defendant she was a niece of one of Plaintiff's former supervisors and that was "good enough" and when he hired Lisa Fesler, he "just brought her in").

compensation after Defendant terminated his employment. And, as noted *supra*, he deposited his commissions into his own corporation's accounts and then paid himself a salary out of those funds, making appropriate tax withholdings in the process. He also paid his own employees and made appropriate withholdings from their salaries. Despite Plaintiff's protestations to the contrary, these factors all indicate that the parties believed, anticipated, and intended, that Plaintiff was an independent contractor, and not an employee of Defendant.

■ The twelfth and final *McCarthy* factor, the right to control the progress of the work, except as to final results, also weighs in favor of independent contractor status. Plaintiff vigorously argues that Defendant "controlled" him by, among other things, requiring him to report back on what he did with the Bacon News clippings, requiring him to respond quickly to calls from Whelen, requiring him to provide weekly reports on activity in his territory, requiring certain letterhead and voice mail messages, and giving him criticisms of his performance. Viewing the entire record in the light most favorable to Plaintiff, however, it is apparent that in his 27 years as a Whelen sales representative, Whelen did little more than impose generic requirements designed to ensure that the desired end result—sales—was achieved. In this regard, the Court finds it prudent to point out that Iowa cases repeatedly emphasize that the most significant factor in determining whether an individual is an employee or an independent contractor is the defendant's right to control the *"means and manner* of performance," not whether Defendant exercised any control whatsoever. *See, e.g., Gaffney v. Dep't of Emp't Servs.*, 540 N.W.2d 430, 434 (Iowa 1995) (emphasis added). In this case, the "control" exerted by Defendant was consistent with the amount of control reasonably necessary by any entity working with independent contractors to ensure that the end result of the independent contractor relationship is achieved. Such control was not so substantial as to amount to the type of day-to-day control or supervision normally found in employer/employee relationships. Indeed, Plaintiff had a high degree of independence and autonomy in carrying out his sales representative duties that is substantially inconsistent with such a relationship. *See generally Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 697 (Iowa 2009) (noting that "one who employs an independent contractor is not liable [for that individual's conduct] unless he retains control of the contractor's day-to-day operations"); *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480 (8th Cir.2000) (finding that plaintiff was an independent contractor on substantially similar facts); *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 814 (Iowa 1994) (examining a franchisor/franchisee relationship under the rubric of employee/independent contractor relationships and finding that a franchisor (hiring party) has the "authority to insure 'the uniformity and standardization of products and services offered' " by the franchisee (hired party) and that guidelines and obligations in relation to that authority do not "affect the control of daily operations" (quotations and citations omitted)).

For these reasons, the Court finds that Plaintiff has failed to generate a genuine issue of material fact sufficient to warrant a jury determination on the question of whether he is an employee or an independent contractor. Taking the evidence in the light most favorable to Plaintiff, as it must, the Court is convinced that no reasonable jury could conclude that Plaintiff was an employee of the Defendant. Summary judgment in favor of Defendant is, therefore, proper.

## B. Existence of a Contract of Employment

Even assuming that Plaintiff could be classified as an employee of Defendant, the Court would still grant Defendant's Motion for Summary Judgment. Under Iowa law, employment relationships are presumed to be "at-will" in nature. "This means the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.'" *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)); *Hunter v. Board of Trustees*, 481 N.W.2d 510, 513 (Iowa 1992). Where the parties are silent as to the duration of the employment relationship, employment at-will is presumed. *See Fitzgerald*, 613 N.W.2d at 280 ("Absent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will") (citing *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 282 (Iowa 1995)). Iowa courts have carved

out only two narrow exceptions to this rule: (1) if a discharge is in clear violation of a well-recognized and defined public policy of the State; or (2) when an employee handbook creates a unilateral employment contract.[31] *Id.* at 282 (quoting *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988) and *French v. Foods, Inc.*, 495 N.W.2d 768, 769–71 (Iowa 1993)); *see also Bradshaw v. Brown Group, Inc.*, 258 F.3d 847, 849 (8th Cir.2001) (discussing the unilateral contract exception to Iowa's at-will employment doctrine).

Plaintiff relies on the second exception to the at-will doctrine, and argues that the Defendant's 1995 Policy created a unilateral employment contract.[32] Pl.'s Br. at 21. A personnel policy is deemed to create a unilateral contract only when the following three elements are met: (1) the personnel policy is sufficiently definite in its terms to create an offer of continued employment; (2) the personnel policy is communicated to and accepted by the employee so as to constitute acceptance; and (3) the employee provides con-

---

**31.** The Iowa Supreme Court noted in *Fitzgerald* that, given the exceptions to the at-will employment doctrine, the "traditional doctrine of termination 'at any time, for any reason, or not reason at all' is now more properly stated as permitting 'termination at any time for any *lawful* reason.'" *Fitzgerald*, 613 N.W.2d at 280 (quoting *Phipps*, 558 N.W.2d at 202 and *Lockhart v. Cedar Rapids Comm. Sch. Dist.*, 577 N.W.2d 845, 846 (Iowa 1998)).

**32.** Plaintiff argues that the Court should consider the terms of the 1985 Document to be a unilateral contract of employment. Pl.'s Br. at 21. However, the 1985 Document ceased to apply to Plaintiff when he was terminated from promoting the automotive product line of Defendant in 1994. *See* Def.'s Facts ¶ 18. Even assuming, however, that the 1985 Document could be considered a unilateral contract, it was superseded by subsequent documents, namely the 1994 and 1995 Policies. Moreover, while the termination provision found in paragraph 37 of the 1985 Document

provides that representatives with performance problems "will be put on 'notice'" and provided a probationary period, *see* Pl.'s App. at 62, that provision is specifically linked to paragraph 4 of the 1985 policy, which provides that if a performance issue arises, "then the management *may* elect to implement 'notice' or 'termination' procedures on some or all of these [performance] areas," utilizing the "procedures outlined in Paragraph 37." *Id.* at 57 (emphasis added). Hence, even if the 1985 Document were a unilateral contract, the Court would not find that Defendant breached it because the decision to place an employee on notice or a probationary period was discretionary by the 1985 Document's terms.

Likewise, to the extent that Plaintiff argues that the 1994 Policy created a unilateral contract of employment, the Court finds that the 1994 Policy was superseded by the 1995 Policy. Regardless, save for minor changes in how "sales representatives" are titled in the two policies, they are substantially identical.

sideration.[33] *Anderson*, 540 N.W.2d at 282 (quoting *McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989)). Defendant does not dispute that the personnel policies were communicated to and accepted by Plaintiff and that Plaintiff provided consideration by continuing to work for Defendant. Thus, the Court will only analyze whether the terms of the policy were sufficiently definite to create an offer of continued employment.

In determining whether the personnel policy is sufficiently definite in its terms to create an offer of continued employment, the main consideration is whether a reasonable employee, upon reading the policy, would believe they had been guaranteed certain protections by their employer. *Jones v. Lake Park Care Ctr.*, 569 N.W.2d 369, 376 (Iowa 1997).[34] In making this determination, the Court considers: (1) whether the personnel policy in general and the disciplinary procedures in particular constitute mere guidelines or directives; (2) whether the language of the disciplinary procedures is detailed and definite or general and vague; and (3) whether the employer has the power to alter the procedures at will. *Id.* at 375 (quoting *Anderson*, 540 N.W.2d 277 at 286); *see also Randall v. Buena Vista Cnty. Hosp.*, 75 F.Supp.2d

946, 968 (N.D.Iowa 1999); *Curtis v. Rockwell Collins, Inc.*, No. 00–0593, 2001 WL 194824, at *1–2 (Iowa Ct.App. Feb. 28, 2001). If the language of the personnel policy is vague, creates procedural guidelines, and reserves the right for employers to change procedures, the personnel policy does not create a unilateral employment contract. *King v. Hawkeye Cmty. Coll.*, C98–2004, 2000 WL 133955, at *4 (N.D.Iowa Jan. 3, 2000).

In this case, the 1995 Policy provided, in regard to termination, that Defendant "reserves the right to terminate portions of territories or individual product lines of a given Authorized Managing Sales Representative"; that "[e]very effort will be made to provide prior warnings of an AMSR's failings"; and that if, "in the opinion of the Management of Whelen Engineering Company, an AMSR has not met general goals as detailed, such AMSR may be put on 'notice' (i.e. probationary period) up to 6 months that mandates improved performance." *See* Pl.'s App. at 94. Upon careful consideration, the Court concludes that the terms of the 1995 Policy, particularly with regard to termination, are not sufficiently definite to create a unilateral employment contract for at least two distinct reasons.

---

**33.** Except when there is ambiguity, the question of whether a written instrument such as a personnel policy binds the parties in contract is a question of law. *See French*, 495 N.W.2d at 770 (quoting *Fogel v. Trustees of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989)); *Hinshaw v. Ligon Indus., L.L.C.*, 551 F.Supp.2d 798, 809 (N.D.Iowa 2008).

**34.** Plaintiff argues that he reasonably believed that he was guaranteed notice of deficient performance prior to termination based on the fact that the 1985 Document contained an assurance that "such Representative *will* be put on 'notice,'" which demonstrated Defendant's clear intent to be bound by certain provisions regarding termination. Pl.'s Br. at 23–24. As noted previously, however, the

first page of the 1985 policy contains the language that "revisions will be made from time to time." Def.'s App. at 153; *see Jones*, 569 N.W.2d at 375 ("[T]he reservation of [the right to change or revoke the employee handbook] may indicate an employee should not rely on the procedures outlined in the handbook."); *Bradshaw v. Brown Group, Inc.*, 258 F.3d 847, 851 (8th Cir.2001) (finding that language providing that policies are subject to change at any time is further evidence that a reasonable employee would not view the manual as an alteration of at-will employment status). Moreover, as discussed in detail in footnote 30, the 1985 Policy was superseded by subsequent policies and was discretionary when read in its totality.

First, the disciplinary procedures outlined in the 1995 Policy specifically state that an employee "may" be put on notice and be granted a probationary period. Such language indicates that the termination provision was merely a guideline, as it leaves the ultimate decision of whether to utilize such a procedure to management's discretion. *See Thompson v. City of Des Moines,* 564 N.W.2d 839, 845 (Iowa 1997) (indicating that the use of discretionary language, such as "may," as opposed to mandatory language, such as "shall" or "must," is evidence of policies, not directives). Indeed, classification of disciplinary procedures as directives generally requires language of command, which is totally lacking in the 1995 Policy. *See King,* 2000 WL 133955, at *4.(finding that commanding language such as "shall" and "will" in an employee handbook is indicative of the existence of a unilateral employment contract); *Anderson,* 540 N.W.2d at 287 (relying on mandatory "shall" language to find sufficient definiteness to constitute a unilateral employment contract).

▮▮ Second, the language of the disciplinary procedures is general and vague. Section I.p.2 states that "every effort will be made to provide prior warning" of performance deficiencies to sales representatives. Such language, however, neither specifies how much notice an employee should expect prior to termination nor the method by which such notice will be given. *See Fogel v. Trustees of Iowa*

*Coll.,* 446 N.W.2d 451 (Iowa 1989) (finding handbook's dismissal and disciplinary provisions too vague and indefinite to constitute unilateral contract). Indeed, a finding of definiteness requires a fair amount of specificity in the disciplinary procedures. *See Jones,* 569 N.W.2d 369 (finding that where offenses were separated into four distinct groups and the policy required specific actions to be taken depending on the type of infraction); *Anderson,* 540 N.W.2d at 287 (finding support for the existence of a unilateral contract where disciplinary procedures in handbook were specific, detailed, progressive, and contained language of command). Here, Defendant's disciplinary provisions do not list any specific violations, nor do they outline specific actions to be taken depending on the type of violation. Thus, the language of Defendant's disciplinary provisions is not detailed and definite, and this fact weighs strongly against a conclusion that the 1995 Policy constitutes a unilateral contract. *See Fogel,* 446 N.W.2d at 456 (stating that an employer's unspecific guidelines "merely reflect[ ] the terminable-at-will status of its employees").[35]

▮▮ Accordingly, the Court finds that the 1995 Policy is not sufficiently definite in its terms to create an offer of continued employment, or to warrant an employee in believing that he had certain rights prior to termination, because a reasonable employee reading the policy would not believe he had been guaranteed any particular protections by Defendant.[36] *See id.* at 451

---

**35.** Plaintiff argues that *Fogel* is distinguishable because "it considered only the question of whether such handbooks created an offer of "permanent employment." " Pl.'s Br. at 22. Plaintiff's reliance on a classification of "permanent employment" is misplaced, however, as "permanent employment" is defined as "a contract … for an indefinite time, terminable at the will of either party." *Albert v. Davenport Osteopathic Hosp.,* 385 N.W.2d 237, 238 (Iowa 1986). *Fogel,* in fact considered "whether the terms of the [employee]

handbook [were] sufficiently definite to constitute an offer of *continued employment."* *Fogel,* 446 N.W.2d at 456 (emphasis added). Hence, it is apposite to the present case.

**36.** The Court recognizes that the length of Plaintiff's service to Defendant—27 years—makes application of the at-will employment doctrine particularly harsh in this case. Plaintiff's long service record, however, is simply not enough to defeat application of the doctrine under existing Iowa law.

(finding an "employment manual was too indefinite to create an enforceable unilateral contract giving rise to a cause of action for its breach"); *Thompson*, 564 N.W.2d at 844–45 (finding employee handbook insufficiently definite to create offer of continuous employment or to warrant employee in believing he could only be terminated for just cause); *Anderson*, 540 N.W.2d at 277 (finding employee handbook insufficiently definite to constitute valid offer to employee to utilize progressive disciplinary procedures).[37]

### C. Breach of Contract

■■■ To sustain a claim for breach of contract, Plaintiff bears the burden of proving: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that he has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract; and (5) that plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)).

■■■ Even assuming that Plaintiff could demonstrate that he was an employee and that the 1995 Policy created a unilateral contract of employment, Plaintiff's claim would still fail because Plaintiff has failed to demonstrate the fourth element of a breach of contract claim. That is, Plaintiff has not identified any evidence that would even arguably demonstrate that Defendant breached a specific provision of the 1995 Policy.[38]

Plaintiff contends that the 1995 Policy obligated Defendant to provide him with notice and an opportunity to cure any deficient performance, and that Defendant could not terminate Plaintiff without just cause. As to Plaintiff's "just cause" assertion, however, Plaintiff has not identified a single provision in the 1995 Policy that even arguably constitutes a "termination for just cause only" provision. *See Porter v. Pioneer Hi–Bred Int'l, Inc.*, 497 N.W.2d 870, 870 (Iowa 1993) (declining to find a "good-cause requirement by implication" where the plaintiff could not "point to any specific incidents, statements, or conduct on the part of Pioneer that caused him to believe that he could be terminated only for good cause").

With respect to Plaintiff's claim that he was entitled to notice and an opportunity to cure before termination, the plain language of the alleged employment contract provides that management "may" put an employee on notice and provide a probationary period. Pl.'s App. at 94. Absent some language of command, no reasonable jury could conclude that Defendant violated a provision that expressly provided it discretionary authority to determine whether notice and an opportunity to cure should be given. Moreover, despite indications that Plaintiff's performance—at least in later years—was substandard, there is no real dispute in the record that the

---

37. Plaintiff argues that *Anderson* is distinguishable because it had "specific disclaimers within the language of the policy manual" and, as a result, the "document[ ] did not create an offer of employment." Pl.'s Br. at 22. Indeed, in *Anderson*, the court ultimately concluded that no unilateral contract had been created. The Court agrees that the presence of a disclaimer will weigh against a finding of a unilateral contract, however, a disclaimer is neither necessary nor dispositive. Rather, "[a] disclaimer should be considered in the same manner as any other language in the handbook," in determining whether the employer has or "has not assented to be bound by the handbook's provisions." *Anderson*, 540 N.W.2d at 288.

38. Plaintiff's claim would also fail for the same reasons if the 1985 Document or the 1994 Policy were considered unilateral contracts.

stated reason for Plaintiff's termination was that the company was going in a new direction and that Plaintiff did not fit into that scenario. Thus, even if Plaintiff had right to notice of, and an opportunity to cure, any substandard performance,[39] he has failed to show that substandard performance was the actual reason for his termination. Finally, the termination provision of the 1995 Policy explicitly provides that the company "reserves the right to terminate portions of territories or individual product lines of a given" sales representative. Pl.'s App. at 94. Though Plaintiff attempts to distinguish between the termination of a "portion" of his territory and termination of his "entire" territory, the Court finds this argument unconvincing. Plaintiff's termination was entirely consistent with Defendant's reservation of rights. Accordingly, no reasonable jury could find a breach of contract on the facts contained in the present record.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion to Strike (Clerk's No. 50) is DENIED as moot. Defendant's Motion for Summary Judgment (Clerk's No. 36) is GRANTED in its entirety. The Clerk of Court is directed to enter judgment in favor of Defendant on Plaintiff's Amended Complaint.

IT IS SO ORDERED.

---

39. Given the multiple notices of performance deficiencies articulated in Section I, *supra* (pp. 9–10) it would be decidedly difficult, if not impossible, for Plaintiff to demonstrate that Defendant failed to provide him with notice of performance deficiencies and an opportunity to cure them.