Rebecca A. JONES, Appellee,

v.

**LAKE PARK CARE CENTER, INC.,**
**James Rogers, and Pamela**
**Rogers, Appellants.**

No. 96–696.

Supreme Court of Iowa.

Sept. 17, 1997.

Rehearing Denied Oct. 23, 1997.

Douglas A. Fulton and Russell J. Hansen of Connolly, O'Malley, Lillis, Hansen & Olson, L.L.P., Des Moines, for appellants.

Richard J. Barry and Michael R. Bovee of Montgomery, Barry & Bovee, Spencer, for appellee.

Considered by HARRIS, P.J., and CARTER, ANDREASEN, TERNUS, and SCHULTZ,* JJ.

* Senior judge assigned by order pursuant to Iowa

ANDREASEN, Justice.

Rebecca Jones (Becky) brought an action at law against her employer, Lake Park Care Center, Inc. (Care Center), and its sole shareholders and officers, James Rogers (James) and his wife Pamela Rogers (Pam). Becky claimed the Care Center breached its employment contract with her and the Rogers intentionally interfered with the employment contract resulting in both compensatory and punitive damages. The defendants denied the allegations and the Rogers affirmatively urged they were protected by a qualified privilege granted to them as officers and directors of the Care Center. Following a bench trial, the district court awarded compensatory damages of $320,064 against both the Care Center and the Rogers individually and punitive damages of $50,000 against the Rogers. Following the court's ruling on a posttrial motion, the defendants appeal. We affirm.

## I. Scope of Review.

■ Law actions are reviewed for correction of errors. Iowa R.App. P. 4. The facts as found by the court have the force of a special verdict and are binding on us if they are supported by substantial evidence. *See* Iowa R.App. P. 14(f)(1). Evidence is substantial if a reasonable mind could find it adequate to reach the same findings. *Pierce v. Farm Bureau Mut. Ins. Co.,* 548 N.W.2d 551, 553 (Iowa 1996).

■ Here, the district court made specific findings as to the veracity of key witnesses. It observed:

The court finds that the testimony of Rebecca, for the most part, is reasonable and consistent with her claim. While testifying, she demonstrated intelligence, good memory and knowledge of the facts of the case. The defendants, Pamela Rogers and James Rogers, while testifying, demonstrated a lack of intelligence, memory and knowledge of the facts. Also, many of the witnesses called on behalf of the defendants demonstrated a bias or prejudice against Rebecca. Many of the witnesses called on behalf of the defendants were

Code section 602.9206 (1997).

impeached by their prior testimony at the unemployment hearing. Many of the witnesses called on behalf of the defendants showed a lack of intelligence, memory and knowledge of the facts. The court concludes that, overall, Rebecca's testimony, her appearance, conduct, intelligence, memory and knowledge of the facts persuades the court that her version of what happened is much more plausible than the version as related by the defendants.

We view the evidence in the light most favorable to upholding the judgment. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 76 (Iowa 1994).

## II. *Background Facts and Proceedings.*

Becky is forty-seven years of age. After graduating from high school, she completed a nine-month course in business school and then worked several years as a secretary. While working as a secretary-bookkeeper in a nursing home, she attended a community college where she obtained, in 1985, a two-year associate degree in health care administration. After obtaining this degree, she was employed as the administrator of a nursing home in Hull, Iowa. Her employment was terminated by her employer in January of 1989. Three months later she started working as an administrator in the care center at Lake Park, Iowa. This is a fifty-one-bed nursing home with approximately forty employees. The nursing home was sold to the Rogers in July of that year. Pamela Rogers was the licensee and the Care Center operated the facility.

Shortly after the Rogers purchased the Lake Park facility, Pam suggested to Becky that the center needed an employee handbook. Becky, the administrative assistant Melanie Jurgensen (Melanie), and the director of nursing Gayle Eral (Gayle) collected employee handbooks and written personnel policies that they had received from prior employers and gave them to Pam. She intended to use them as examples to develop a policy handbook for the Care Center. Some time later, Becky inquired as to how the employee handbook was coming. When Pam told Becky she had not started on it, Becky suggested Melanie was interested in helping and would work with her on a draft handbook. Pam agreed to the plan and returned the samples to Becky.

Melanie then reviewed the handbooks and selected the best two or three provisions on the various topics. She and Becky then picked out the best provisions and included them in a rough draft of a proposed employee handbook. Each proposed policy was put on a separate page and delivered to Pam. She then reviewed the proposed handbook, made some changes, and returned it to Becky with instructions to go ahead and print it in a final form and pass it out to the employees.

The handbooks were distributed to all staff members including Becky. Each employee was asked to sign and return a receipt to the administrator to acknowledge their receiving a handbook. The twenty-four page handbook contained a welcome, general policies on hiring, schedules, time cards, pay days, resignation, benefits, disciplinary action, additional miscellaneous policies, and an organizational chart. All the employees received the handbook and returned a signed receipt. On December 12, 1991, Becky signed a receipt. The receipts were placed in each employee's personnel file at the Care Center.

In July 1992, Pam gave Becky a disciplinary warning. The written warning identified specific incidents that demonstrated Becky's poor employee relations, including her terrible working relationship with the director of nursing, and Becky's unpredictability. In response, Becky explained in writing her actions and acknowledged there was "a part of my personality that others find intimidating or abusive and I will need to keep that in mind when dealing with staff problems or situations in the future." Pam placed Becky on probation with a review in one month and a second review at the end of two months. Becky received psychiatric counseling for depression at Pam's suggestion and at the Care Center's expense. Becky's attitude and behavior improved in 1992 after receiving the warning and counseling. However, her relationship with the director of nursing, Gayle, remained poor.

In May 1993, the certified nurses's aids (CNA's) sent a list of demands to the Care

Center, the administrator, and the director of nursing. Pam was concerned that the CNA's might strike, or refuse to perform their assigned duties. She hired her sister Cynthia Bartling (Cindy), a registered nurse (RN) and consultant, to visit the center and evaluate the situation.

Cindy spent the months of May, June, and July at the center. She met with every employee to determine what problems existed at the Care Center. She determined that nearly all of the professional staff were threatening to leave because of the tension existing at the center and that the relationship between Becky and Gayle had deteriorated to the point where they were not communicating effectively. The professional staff was being divided into "camps," those loyal to Becky and those loyal to Gayle.

At about this same time, the Iowa Department of Inspections and Appeals commenced its annual inspection of the Care Center. The inspection began on July 26 and lasted through July 29. While at the Care Center, Becky had been through four annual department inspections and three follow up surveys. During the 1993 inspection one of the inspectors asked Becky to compile a list of the Care Center's closed files for the past six months. These were the files of residents of the facility that had died, transferred to the hospital and not returned, or who had returned to their home after being residents at the facility.

After receiving the inspector's request, Becky went to Gayle and asked her whether the closed files had been completed. Gayle reported that not all of the closed files had been completed and that Becky should give the inspector a list of the files that had been completed. Becky believed Gayle was asking her to lie to the state inspectors about the status of the closed files. She told Gayle she would not lie to the inspectors.

Following the completion of the state inspection survey on July 29, Cindy reported to the Rogers that Becky "sacrificed facility performance during the state survey in an effort to make (Gayle) look incompetent." She recommended that Becky be terminated. The following day James contacted Sandra DeGroot about the administrator position at the Care Center. At about this same time Pam called Becky and requested she post a notice of an all-staff meeting to be held on August 9. On August 2 or 3, DeGroot was hired as the new administrator of the Care Center by the Rogers.

On August 6, Pam and James met with Becky at the facility and Becky was told her employment was terminated. The following day she was given a written termination notice that gave as a reason "inability to provide continuity in the facility by failure to provide effective leadership." At the August 9 all-staff meeting, Pam introduced the new administrator. She reported that Becky could not compromise on certain issues, that she was unable to fulfill some administrative responsibilities, and that as a result Becky had resigned.

The Care Center was paying Becky an annual wage of $31,939 plus other benefits including paid vacation and health insurance at the time of her discharge. Following her discharge, she searched for employment as a nursing home administrator and for other gainful employment for which she was trained. She was able to secure only part-time employment paying approximately $1239 monthly. Assuming she had continued her employment until she reached age sixty-five, her loss of earnings and fringe benefits were calculated to be $320,064 by a forensic economist.

Becky applied for unemployment compensation benefits. The Care Center resisted her application. At the unemployment compensation hearing, James testified Becky's employment was terminated because she had lied to the Care Center employees and that she had taken Care Center property. Neither allegation was found to be true and Becky's claim for unemployment compensation was allowed.

### III. *Breach of Contract.*

 In Iowa, employment relations are presumed to be at-will. *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 281 (Iowa 1995). As a general rule, if no employment contract exists, either party may terminate the relationship for any lawful reason at

any time. *Id.* Two exceptions to the general rule are: (1) when a discharge violates a well-established and defined public policy, and (2) when an implied contract of employment is created by a handbook or employee policy manual guaranteeing that discharge will occur only under certain circumstances. *French v. Foods, Inc.,* 495 N.W.2d 768, 770 (Iowa 1993).

■ An implied contract of employment can arise from an employee handbook if: (1) the handbook is sufficiently definite in its terms to create an offer, (2) it is communicated to and accepted by the employee so as to create an acceptance; and (3) the employee provides consideration. *McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989). The Rogers do not contend the handbook was not communicated to Becky or that she did not provide consideration. They do, however, deny that the terms of the handbook were sufficiently definite so as to create a contract.

■ As an initial matter, the Rogers assert the employee handbook was not intended to apply to the administrator of the Care Center. This claim is refuted by the terms of the handbook. The handbook includes the position of administrator in the "Employee Classification and Definitions" section. The handbook further states:

> This booklet is designed to inform *every employee* of what is expected from them as an employee of the Lake Park Care Center, and also to tell *all employees* what they can expect of the Lake Park Care Center.

(Emphasis added.) There is substantial evidence to support the trial court's finding that the handbook applied to the administrator.

■ Becky argued, and the trial court agreed, the language of the handbook was sufficiently definite to create an employment contract. As a result, Becky insists the progressive discipline policy gave her contractual rights that the Rogers violated by summarily terminating her. To determine whether the language of an employee handbook creates a contract we look at the following factors:

(1) Is the handbook in general and the progressive disciplinary procedures in particular mere guidelines or a statement of policy, or are they directives?

(2) Is the language of the disciplinary procedures detailed and definite or general and vague?

(3) Does the employer have the power to alter the procedures at will or are they invariable?

*Anderson,* 540 N.W.2d at 286 (citations omitted).

■ The key to determining whether a contract has been created is whether a reasonable employee upon reading the handbook would believe they had been guaranteed certain protections by their employer. Here, the handbook stated it was "to be regarded as *binding* on both the employee and management." (Emphasis added.) The "disciplinary actions" section of the handbook began with the statement:

> The purpose of these rules is to define the employee's rights, not to restrict them. They exist to protect the best interest of all employees. The rules are itemized, along with the corrective action for each group of rules, to assure the employees are treated fairly and with consistency.

The progressive discipline policy divides offenses into four groups. Three of the four groups contain a statement to the effect that the list of offenses was not intended to be all inclusive. Specific disciplinary actions were prescribed for each group. The disciplinary steps to be taken for each infraction and any subsequent violations were summarized in a table. The language used in the policy constitutes more than mere guidelines. It requires specific action to be taken for different levels of violations and, thus, meets the first and second factors of definiteness.

■ The Care Center reserved the right to change or revoke the employee handbook. The reservation of that right might indicate an employee should not rely on the procedures outlined in the handbook. However, until management exercised its authority to change the terms of the handbook, the employee's reliance on its provisions was reasonable because the handbook was "binding"

on both the employee and management. Merely reserving the right to change the provisions is not sufficient to defeat the creation of an implied contract. To ensure no implied contract is created by a handbook, the employer would be wise to include an appropriately drafted disclaimer. *Anderson,* 540 N.W.2d at 288. Here, no disclaimer was included in the handbook. We find there was sufficient evidence to support the court's finding that an implied contract of employment was created by the handbook.

■ Next, we must consider whether there is evidence that this employment agreement was breached. The handbook listed various infractions and to which group they belonged. The gravity of the violations is the distinguishing feature separating one group of violations from another. For example, failing to maintain acceptable standards of personal hygiene is a group one violation while theft of company property is a group four violation.

The stated reason for Becky's termination was "inability to provide continuity in the facility by failure to provide effective leadership." Under the terms of the progressive disciplinary policy, the first three groups required a written warning. The trial court concluded the stated violation fell within one of the groups requiring a written warning. Becky did not receive such a warning. Instead, she was summarily discharged. There is substantial evidence in the record that the Care Center breached its employment contract with Becky.

IV. *Compensatory Damages.*

■ To support an award of compensatory damages for loss of past and future wages and benefits, the plaintiff must show such award is reasonable. *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 687 (Iowa 1990). The award of future damages must be based on the likely duration of the terminated employment. *Id.* If there is a reasonable basis in the record from which the amount of damages can be inferred or approximated, recovery of damages for breach of contract or tortious interference with the contract will be allowed. *Id.* at 688.

The determination of future losses is for the jury or the court if tried to the court. *Id.*

The district court found the defendants presented no evidence that Becky did not reasonably attempt to mitigate her damages. The defendants did not plead or prove any mitigating circumstances. Becky introduced substantial evidence showing she had submitted applications to over seventy-five potential employers seeking employment as a nursing home administrator or assistant or for other employment in areas she was qualified. We have recognized an award of future damages is consistent with both the traditional damage award for breach of contract as well as the award contemplated by our employment contract case law. *Hunter v. Board of Trustees,* 481 N.W.2d 510, 517 (Iowa 1992). The trial court also concluded Becky's compensatory damages were the same under both the breach of contract action and the interference with a contract action. The court's findings, conclusions, and award of compensatory damages are supported by substantial evidence in the record.

V. *Qualified Privilege.*

■ Before a plaintiff can recover damages against an officer or director of a corporation for the tort of intentional interference with a contract, the plaintiff must prove the officer or director exceeded the qualified privilege and then prove the intentional interference claim. Both issues are submissible to the trier of the facts. *Wolfe v. Graether,* 389 N.W.2d 643, 660 (Iowa 1986). We will first discuss issues relating to the qualified privilege and in the next division focus on the interference claim.

■ Iowa recognizes the existence of a qualified privilege protecting corporate fiduciaries from personal liability for interference with corporate business relations. *Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 778–80 (Iowa 1985). The privilege afforded corporate fiduciaries is not absolute. An officer or director may be held personally liable if the officer or director fails to act in good faith to protect the interests of the corporation. *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d 731, 738 (Iowa 1983); *Hsu v. Vet–A–Mix, Inc.,* 479 N.W.2d

336, 339 (Iowa App.1991); *see also* Thomas G. Fischer, Annotation, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another*, 72 A.L.R.4th 492, § 9 (1989). If an officer or director intends to promote the best interests of the corporation, he or she acts in good faith and is protected from personal liability by the qualified privilege.

■■■■■ Here the trial court found that Rogers did not have a qualified privilege under the facts of the case. The court found "the real reason Rebecca was terminated is because she would not produce false information to the auditor." Terminating an employee for refusing to do an illegal act is a violation of public policy. *Borschel v. City of Perry*, 512 N.W.2d 565, 567 (Iowa 1994). Obviously, it is neither good faith nor in the best interest of the corporation to discharge an employee for refusing to commit an unlawful act. Proof of unlawful conduct is also a factor of proof of the element of improper interference in the tort claim. Since the Rogers' actions exceeded the scope of the qualified privilege, they may be held personally liable for interfering with the contractual relationship between the Care Center and Becky.

### VI. *Intentional Interference with a Contract.*

■■■■■ A party to a contract cannot be liable for tortious interference with that contract. Only a third-party, separate from the contracting parties, can be liable for such a tort. A director or officer acts as an agent of the corporation when acting in good faith to protect the interests of the corporation. When acting as an agent within the scope of the qualified privilege, there can be no tortious interference because only two parties exist; the corporation and the contracting party. However, when an officer or director acts beyond the scope of their qualified privilege, they are no longer acting as agents of the corporation and can be personally liable for their acts. *Hunter*, 481 N.W.2d at 518. The elements of a claim for intentional interference with a contract are:

(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Nesler v. Fisher & Co.*, 452 N.W.2d 191, 198 (Iowa 1990). In determining whether the defendants' conduct is improper, the following factors are relevant:

(a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Hunter*, 481 N.W.2d at 518.

■■■■■ Here, the Rogers allege the relationship between Becky and Gayle was causing tension and stress among the nursing staff producing a situation where the professional staff members were considering leaving the care facility. They argue Becky's dispute with Gayle over the closed files was an attempt by Becky to make Gayle look bad. The Rogers claim that their motive in discharging Becky was their desire to preserve the Care Center. The court found their predominant motive in discharging Becky was for improper reasons.

We conclude the court's finding is supported by substantial evidence in the record. Direct and circumstantial evidence are equally probative. *See* Iowa R.App. P. 14(f)(16). After Becky refused Gayle's suggestion to submit only those closed files that were complete, Gayle threatened to quit unless Becky was fired. The written reason given for Becky's termination was a lack of leadership and the inability to provide continuity. This is not the reason now urged by the Rogers on appeal. The termination decision was made soon after Gayle threatened to quit and Cindy reported Becky had sacrificed facility performance during the state survey. Following the decision to terminate, a new ad-

ministrator was contacted and hired. The Rogers falsely stated Becky's discharge occurred before a new administrator was hired and falsely reported Becky had voluntarily quit her job at the Care Center. Because substantial evidence supports the trial court's factual findings, we are bound by them.

### VII. *Punitive Damages.*

We review an award of punitive damages for correction of errors at law. *White v. Northwestern Bell Tel. Co.,* 514 N.W.2d 70, 77 (Iowa 1994). Punitive damages may be awarded for tortious interference with a contractual relationship. *Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 404 (Iowa 1982). To support an award of punitive damages, the tort must be committed with either actual or legal malice. *Parks v. City of Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989). Actual malice may be shown by such things as personal spite, hatred, or ill-will and legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. *Id.* The plaintiff must prove by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct constitutes a willful and wanton disregard for the rights of another. Iowa Code § 668A.1(1)(a); *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.,* 510 N.W.2d 153, 156 (Iowa 1993).

When reviewing the amount of the award we have stated:

> Awards [of punitive damages] will be tested with a view of the extent and nature of the outrageous conduct, the amount necessary for future deterrence, and with deference to the relationship between the punitive award and plaintiff's injury, as reflected in any award for compensatory damages. In addition to these traditional factors, we shall consider all circumstances surrounding the conduct and relationship between the parties.

*Ezzone v. Riccardi,* 525 N.W.2d 388, 399 (Iowa 1994).

The trial court found the Rogers' actions constituted a willful and wanton disregard for Becky's rights and were specifically directed against her. It also found Becky

had established her claim for punitive damages by a preponderance of clear, convincing, and satisfactory evidence. Based on our review of the record, we conclude the district court's award of punitive damages to be supported by the evidence.

**AFFIRMED.**