# In the Iowa Supreme Court

No. 24–1645

Submitted January 20, 2026—Filed May 22, 2026

**Rhonda Baldwin,** as executor of the **Estate of Garrett O. Baldwin,**

Appellee,

vs.

**Central Iowa Hospital Corp.,** d/b/a **Iowa Methodist Medical Center,**

Appellant.

Appeal from the Iowa District Court for Polk County, Coleman McAllister, judge.

Interlocutory appeal from the denial of a motion for summary judgment on a wife's claims for vicarious liability based on the alleged negligence of a nurse, direct negligence in retaining that nurse, emotional distress damages, and punitive damages following her husband's death. **Reversed and Case Remanded.**

McDonald, J., delivered the opinion of the court, in which all justices joined.

Jeffrey R. Kappelman (argued), Erik P. Bergeland, Peter R. Lapointe, and Joseph F. Moser of Finley Law Firm, P.C., Des Moines, for appellant.

Gary Dickey (argued) and Matthew Sahag of Dickey, Campbell, & Sahag Law Firm, PLC., Des Moines, for appellee.

**McDonald, Justice.**

Plaintiff Rhonda Baldwin, individually and as executor of the Estate of Garrett Baldwin, brought this suit against nurse Andrea Cline and Central Iowa Hospital Corp. d/b/a Iowa Methodist Medical Center arising out of the death of her husband. This appeal arises from the district court's denial of the hospital's motion for summary judgment. At issue in this appeal are the following questions: (1) whether the plaintiff's claim for negligent retention and supervision is barred because it is not disputed that the hospital is vicariously liable for the alleged negligence of its employees; (2) whether the summary judgment record shows there is a triable issue of fact with respect to Rhonda's request for bystander emotional distress damages; and (3) whether the summary judgment record shows there is a triable issue of fact on the plaintiff's request for punitive damages. Our review is for the correction of errors at law. *Kostoglanis v. Yates*, 956 N.W.2d 157, 158 (Iowa 2021).

I.

The summary judgment record, when viewed in the light most favorable to the plaintiff, shows the following. Garrett Baldwin presented to the emergency room on March 26, 2021, with abdominal pain. Physicians diagnosed him with acute pancreatitis without infection or necrosis, and he was admitted to the Iowa Methodist Medical Center (IMMC) for continued care. Baldwin's condition did not improve, and he was transferred to the critical care unit at IMMC. As a result of Baldwin's declining renal function, he was started on Continuous Renal Replacement Therapy (CRRT), a form of continuous dialysis. The CRRT was administered through a catheter inserted into Baldwin's jugular vein. Baldwin remained in the critical care unit for the next several days.

Nurse Andrea Cline was on Baldwin's critical care team. On April 11, she was responsible for checking the CRRT tubing and monitoring Baldwin. The CRRT tubing was supposed to be, but was not, secured with a Luer lock. A Luer lock is a standardized, threaded, and secure connection system used to join small fluid fittings to ensure they do not become disconnected. On the morning of April 11, Cline did not document in Baldwin's chart that the tubing connections were secure; the inference being that Cline did not check to ensure that the tubing connections were secure. At some point during that morning, Cline, in an effort to move some of the CRRT tubing out of the way, fastened the CRRT tubing to Baldwin's bed railing using a tourniquet tied too tightly or a clip that was too small to allow slack in the tubing. Later that afternoon, Baldwin asked to be repositioned in his bed. When Cline went to reposition him, the tubing did not have enough slack to accommodate the new position, and the catheter was pulled from Baldwin's neck. This allowed air to enter the tube, which caused Baldwin to suffer cardiac arrest.

Rhonda was sitting next to Baldwin and holding his hand at the time this occurred. Rhonda testified during her deposition that she was watching a football game on the television when "the next thing [she] kn[e]w," she heard a "kabam!" Rhonda was not sure what had happened, but she thought that maybe Cline accidentally dropped the bed while she was trying to lower it. Cline called for help, and hospital staff flooded into the room. Someone started chest compressions. Rhonda was escorted out of the room and taken to a conference room. She heard a "code blue bed 12 ICU" over the loudspeaker, and she "knew enough to know what that meant."

Baldwin died twelve days after this incident, but the parties dispute the cause of death. Rhonda claims that Baldwin was resuscitated but that he never

fully recovered from the disconnection event and died as a result of the cardiac arrest. IMMC contends that Baldwin was immediately resuscitated after the disconnection event and that he died twelve days later from unrelated causes, including necrosis of the pancreas, spleen, liver, and prostate; hypertensive atherosclerotic cardiovascular disease of the heart and kidneys; pleural effusions; acute tubular necrosis; hepatic steatosis; jaundice; and obesity.

Just under one year after Baldwin's death, Rhonda filed this suit against Cline and IMMC. With respect to Cline, Rhonda alleged that Cline was negligent by failing to secure the CRRT tubing connection and by improperly fixing the CRRT tubing to the bedrail, among other things. Rhonda alleged that IMMC was vicariously liable for Cline's negligence. With respect to IMMC, Rhonda alleged that IMMC was independently negligent in hiring, retaining, and supervising Cline. As to this theory of liability, Rhonda claimed that Cline was involved in an incident approximately two years prior to Baldwin's death involving the improper placement of a feeding tube in a patient, along with related monitoring failures, that resulted in the patient's death. The patient's estate brought suit, and it was settled confidentially. Cline was formally disciplined by the Iowa Board of Nursing in February 2024 for her failure in that case "to assess, accurately document, evaluate or report the status of a patient" and for "committing an act or omission which may adversely affect the physical or psychosocial welfare of the patient." Cline did not lose her nursing license. Given Cline's involvement in a different case involving the death of a patient, Rhonda contended that IMMC was negligent in retaining Cline.

After Rhonda filed this suit, IMMC requested that Rhonda dismiss Cline from the case. Rhonda agreed on the conditions that IMMC stipulate to vicarious liability for the negligence, if any, of its employed nurses who provided care to

Baldwin, including Cline, and that the dismissal would not waive Rhonda's vicarious liability claim against IMMC. IMMC agreed to those conditions. Rhonda filed the stipulations and dismissal on September 15, 2022.

After the parties conducted discovery, IMMC moved for summary judgment on three grounds. First, IMMC argued that the negligent retention claim was barred, or preempted, because IMMC agreed it was vicariously liable for Cline's negligence, if any. Among other things, IMMC argued that allowing the negligent retention claim to proceed here would allow Rhonda to make a double recovery and that allowing the claim was merely a way for Rhonda to introduce prejudicial and otherwise irrelevant information regarding Cline's involvement in the death of a different patient. Second, with respect to emotional distress damages, IMMC argued that Rhonda and her children could not recover emotional distress damages because they suffered no physical injury and the bystander liability theory was inapplicable here. Finally, IMMC argued that punitive damages were unavailable as a matter of law because the record did not contain evidence of willful or wanton conduct.

The district court denied summary judgment on the negligent retention claim, concluding that direct liability claims against an employer are not barred or preempted when there is no dispute that the employer is vicariously liable for the underlying acts of employee negligence. The district court acknowledged that this was an issue of first impression in Iowa, but it decided that the non-preemption rule—the rule allowing a negligent retention claim even where the employer is undisputedly vicariously liable for the employee's conduct—"is the better rule and the one most likely to be adopted by the Iowa Supreme Court."

On the emotional distress issue, the court granted summary judgment as to the Baldwins' children, who were not present during the disconnection event,

but denied summary judgment as to Rhonda. The court reasoned that IMMC's argument "pars[ed] the disconnection event too thinly" and held that Rhonda's testimony created a triable question under *Barnhill v. Davis*, 300 N.W.2d 104, 108 (Iowa 1981) (en banc), as to whether she contemporaneously observed the negligent event and reasonably believed death or serious injury would occur.

The court also denied summary judgment with respect to IMMC's motion on punitive damages. In support of her punitive damages request, Rhonda retained an expert, nurse Michael Mayfield, who opined that Cline's conduct in the prior case involving a patient death was reckless and should have resulted in her immediate termination. She also pointed to the testimony of IMMC's nurse manager, Janell Smith, who agreed that she would not want to keep any nurse who had caused a patient's death. Based on these opinions, Rhonda argued that IMMC's continued employment of Cline was reckless. Rhonda also argued that IMMC ratified Cline's conduct when IMMC's chief medical officer, Dr. Tracy Eckhardt, sent a letter dated June 23, 2021, to Rhonda regarding the results of the internal investigation into the events of April 11 stating that "[t]he findings of the investigation confirmed that the dialysis connections were properly placed, per our protocol, and that staff actions, including monitoring, was appropriate." The district court concluded that it could not determine as a matter of law that punitive damages are unavailable in this case. IMMC sought interlocutory review of each denial, and we granted the appeal.

II.

The district court was correct that this is the first time this court has squarely addressed the question of whether a plaintiff's claim for negligent hiring, retention, or supervision (hereafter, a negligent retention claim) is unavailable if the employer does not contest that the employee's conduct was

within the scope of employment and that the employer is vicariously liable for the employee's negligence, if any. In answering this question of first impression, we discuss the development of the negligent retention claim in Iowa, we survey the persuasive authorities on the preemption question, and we then resolve the question.

A.

The leading case in Iowa regarding claims for negligent hiring, retention, and supervision is *Godar v. Edwards*, 588 N.W.2d 701 (Iowa 1999). In that case, a former student of a school brought suit against the school district and the former curriculum director of the school district. *Id.* at 703. The former student sought damages for sexual abuse allegedly perpetrated upon him by the curriculum director both on and off school grounds. *Id.* Because it was disputed whether the curriculum director was acting within the scope of his employment, the plaintiff asserted claims against the district for respondeat superior and negligent hiring, retention, and supervision. *See id.* at 703–04. The district court granted the defendants' motions for directed verdict as to the plaintiff's claims concerning vicarious liability under the doctrine of respondeat superior and negligent hiring, retention, and supervision. *Id.* at 705.

On appeal, this court first addressed the plaintiff's vicarious liability claim. *Id.* "The well established rule is that under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment." *Id.* "Thus, '[a] claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment.'" *Id.* (alteration in original) (quoting *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994)). This

court affirmed the district court's decision to grant the district's motion for directed verdict, concluding "that any alleged sexual abuse by [the employee] was not an act committed within the scope of his employment for which the school district may be held liable." *Id.* at 706.

The *Godar* court also affirmed the district court's dismissal of the direct negligence claims against the school district. *Id.* at 710. The *Godar* court explained that "whether the school district is liable based on a theory of negligence is separate and distinct from liability under the doctrine of respondeat superior." *Id.* at 707 n.3. At that time, this court had "never addressed the validity of a claim against an employer based on negligent hiring." *Id.* at 708. After reviewing the relevant authorities, this court "join[ed] those jurisdictions that have recognized a claim by an injured third party for negligent hiring and conclude[d] that an employer has a duty to exercise reasonable care in hiring individuals, who, because of their employment, may pose a threat of injury to members of the public." *Id.* at 709. This included actions "for negligent retention and negligent supervision." *Id.*[1] Having recognized the tort, *Godar* concluded that the plaintiff failed to present sufficient evidence to generate a jury question that the district knew or should have known about the abuse. *Id.* at 710.

Since recognizing negligent retention in *Godar,* this court has clarified the elements of the tort. A negligent retention claim against the employer "must include as an element an underlying tort or wrongful act committed by the employee." *Schoff v. Combined Ins. of Am.,* 604 N.W.2d 43, 53 (Iowa 1999)

---

[1]Although not material to the outcome of this case, this court had in fact recognized negligent retention claims prior to *Godar. See, e.g., Cubbage v. Est. of Conrad Youngerman, Inc.,* 134 N.W. 1074, 1076 (Iowa 1912) (affirming plaintiff's verdict against an elevator operator and stating that under Iowa law "[h]abitual negligence and carelessness in the performance of the duties involved in the employment may constitute incompetency chargeable to the employer as negligence in retaining the employé in his service").

(quoting *Haverly v. Kaytec, Inc.*, 738 A.2d 86, 91 (Vt. 1999)). As we later explained, "[a] claim of negligent hiring, retention, or supervision requires proof of *two kinds* of tortious misconduct." *Randolph v. Aidan, LLC*, 6 N.W.3d 304, 309 (Iowa 2024). "There must be proof of *both* (1) *the employer's* negligence in hiring, retaining, or supervising the unfit employee *and* (2) negligence or other tortious misconduct *by the employee*." *Id.*; *see also McCoy v. Thomas L. Cardella & Assocs.*, 992 N.W.2d 223, 228 (Iowa 2023) ("Negligent supervision is only actionable when 'the conduct that proper supervision . . . would have avoided is . . . actionable against the employee.' " (omissions in original) (quoting *Schoff*, 604 N.W.2d at 53)). Stated differently, the employer can only be found negligent on a direct negligence claim if the employee is found negligent first. Thus, while the employer's liability is not derivative in a strict sense, it is nonetheless contingent upon the employee's liability.

## B.

With that background regarding the negligent retention claim in Iowa, we turn to the preemption rule. While this is the first time this court has considered the issue, numerous other courts have addressed it. Some states have adopted the preemption rule (or assumption rule in some jurisdictions): the rule that a plaintiff may not pursue a negligent retention claim where it is undisputed that the employer is vicariously liable for the employee's negligence, if any. Other states have adopted the non-preemption (or non-assumption rule): the rule that the plaintiff is the master of her complaint and may pursue both claims at the same time.

We begin with those states that have adopted the preemption rule. *See Diaz v. Carcamo*, 253 P.3d 535, 543–44 (Cal. 2011); *Ferrer v. Okbamicael*, 390 P.3d 836, 841–42 (Colo. 2017) (en banc), *superseded by statute*, 2021 Colo. Sess.

Laws ch. 147, § 1 (codified at Colo. Rev. Stat. § 13-21-111.5(1.5)(c) (2022)), *as recognized in*, *Brown v. Long Romero*, 495 P.3d 955 (Colo. 2021) (en banc); *Clooney v. Geeting*, 352 So. 2d 1216, 1220 (Fla. Dist. Ct. App. 1977); *Wise v. Fiberglass Sys., Inc.*, 718 P.2d 1178, 1181 (Idaho 1986); *Sedam v. 2JR Pizza Enters., LLC*, 84 N.E.3d 1174, 1178 (Ind. 2017); *Houlihan v. McCall*, 78 A.2d 661, 665 (Md. App. Ct. 1951); *McHaffie v. Bunch*, 891 S.W.2d 822, 826 (Mo. 1995) (en banc); *Weinberg v. Guttman Breast & Diagnostic Inst.*, 679 N.Y.S.2d 127, 128 (App. Div. 1998); *LaPlant v. Snohomish County*, 271 P.3d 254, 257 (Wash. Ct. App. 2011); *Bogdanski v. Budzik*, 408 P.3d 1156, 1162–63 (Wyo. 2018); *see also Cole v. Alton*, 567 F. Supp. 1084, 1085–86 (N.D. Miss. 1983) (predicting Mississippi courts would apply the rule); *Roaf v. Stephen S. Rebuck Consulting, LLC*, 550 P.3d 173, 179 (Ariz. 2024); *Werner Enters., Inc. v. Blake*, 719 S.W.3d 525, 542 & n.* (Tex. 2025) (Young, J., concurring) (noting at least six of Texas's courts of appeals have adopted the rule and expressing approval).

The primary reason "given for holding that it is improper for a plaintiff to proceed against an [employer] on the independent theory of imputed negligence where *respondeat superior* is admitted has to do with the nature of the claim." *McHaffie*, 891 S.W.2d at 826. In adopting the preemption rule, the Colorado Supreme Court explained that vicarious liability and direct negligence claims are both rooted in the employee's tortious acts. *Ferrer*, 390 P.3d at 845. "That is, tortious conduct by an employee is a predicate in direct negligence claims against the employer." *Id.* at 844. Because a plaintiff must prove that the employee engaged in tortious conduct to prevail on a direct negligence claim against the employer, an employer's admission of vicarious liability renders the direct negligence claim superfluous. *See id.*; *see also McHaffie*, 891 S.W.2d at 826. The additional claim adds no compensable damage because the employer has already

acknowledged its liability "for one hundred percent of the damages attributable to the employee's negligence." *Ferrer*, 390 P.3d at 845; *see also Bogdanski*, 408 P.3d at 1162–63.

Courts also express concern that, without the preemption rule, irrelevant and potentially inflammatory evidence would be introduced into the record. Where the plaintiff claims no additional damage from the employer's conduct, not only does the employer's direct liability add nothing to the damages sought, but any evidence related to the employer's direct liability becomes "irrelevant to any contested issue in the case." *McHaffie*, 891 S.W.2d at 826. The only practical effect of allowing the plaintiff to pursue a negligent retention claim is to allow the plaintiff to introduce otherwise inadmissible evidence that is unfairly prejudicial to the individual employee and the defendant. *See id.* (stating "the evidence laboriously submitted to establish other theories serves no real purpose" except for potentially inflaming the jury). "For instance, evidence of an employee's prior convictions for traffic offenses, relevant to the issue of the employer's negligent hiring, may lead a jury to 'draw the inadmissible inference that because the [driver] had been negligent on other occasions he was negligent at the time of the accident.' " *Ferrer*, 390 P.3d at 845 (alteration in original) (quoting *Houlihan*, 78 A.2d at 665).

Double recovery, jury confusion, and judicial economy concerns are also cited by preemption rule courts. *See id.*; *Sedam*, 84 N.E.3d at 1178–79. They reason that the preemption rule eliminates any "danger that a jury will assess the employer's liability twice and award duplicative damages to the plaintiff if it hears evidence of both" a negligent retention claim and a vicarious liability claim. *Ferrer*, 390 P.3d at 845. By contrast, allowing both claims to continue will only "prejudice the employer, confuse the jury, and waste judicial resources when

ultimately the result—that the employer is liable—is the same and the employer has stipulated as much." *Sedam*, 84 N.E.3d at 1178.

Other courts have reached a different conclusion and rejected the preemption rule. *See Quynn v. Hulsey*, 850 S.E.2d 725, 729–30 (Ga. 2020); *McQueen v. Green*, 202 N.E.3d 268, 280 (Ill. 2022); *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1225 (Kan. 1998); *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 (Ky. 2014); *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 331 (S.C. 2008); *Binns v. Trader Joe's E., Inc.*, 690 S.W.3d 241, 253 (Tenn. 2024); *Ramon v. Nebo Sch. Dist.*, 493 P.3d 613, 619 (Utah 2021); *see also Wright v. Watkins & Shepard Trucking, Inc.*, 972 F. Supp. 2d 1218, 1221 (D. Nev. 2013) ("These considerations imply that the Nevada Supreme Court would not adopt the 'majority' approach . . . ."); *Poplin v. Bestway Express*, 286 F. Supp. 2d 1316, 1320 (M.D. Ala. 2003) ("[T]he precedent of the Alabama Supreme Court indicates that Alabama would adhere to the minority view in this situation."); *Smith v. Williams*, No. 05C–10–307, 2007 WL 2677131, at *6 (Del. Super. Ct. Sep. 11, 2007) ("Delaware courts have shown a willingness to entertain both causes of action . . . ."); *Lim v. Interstate Sys. Steel Div., Inc.*, 435 N.W.2d 830, 832–33 (Minn. Ct. App. 1989).

These courts reason that a defendant's stipulation that the employee was acting within the scope of employment cannot foreclose the plaintiff's pursuit of another, separate claim arising out of the employer's separate negligence. *James*, 661 S.E.2d at 332. They explain that an "employer's liability under [a direct liability] theory does not rest on the negligence of another, but on the employer's own negligence." *Id.* at 331. Even though "direct negligence claims . . . may be classified as derivative in the sense that both typically require the plaintiff to prove that an employee's underlying conduct was negligent, the liability

stemming from negligent training and supervision is not vicarious." *Binns*, 690 S.W.3d at 250 (footnote omitted). Therefore, "claims based on [direct negligence] are independent of claims based on respondeat superior, and the existence of one claim does not render the other claim superfluous or unnecessary." *Id.* at 251 (quoting *Gordon v. Tractor Supply Co.*, No. M2015–01049–COA–R3–CV, 2016 WL 3349024, at *12 (Tenn. Ct. App. June 8, 2016)); *see also Marquis*, 961 P.2d at 1225 ("Because the torts of negligent hiring, retention, or supervision are recognized in Kansas as separate torts that are not derivative of the employee's negligence, an admission that the employee was acting within the scope of his or her employment does not preclude an action for both [claims.]")

According to courts that do not follow the preemption rule, "the argument that an independent cause of action against an employer must be precluded to protect the jury from considering prejudicial evidence presumes too much." *James*, 661 S.E.2d at 331. Rather than barring negligent retention claims outright when vicarious liability is uncontested, these courts emphasize the trial court's ability to address concerns about prejudice, duplicative proof, and double recovery through trial management practices. *See McQueen*, 202 N.E.3d at 280 ("[W]e generally rely on the trial court to determine when otherwise relevant evidence should be inadmissible because its probative value is outweighed by the risk of unfair prejudice."); *James*, 661 S.E.2d at 331; *Binns*, 690 S.W.3d at 252 ("While we agree that inflammatory evidence often exists in lawsuits, the Tennessee Rules of Evidence exist, in part, to guard against the admission of overly prejudicial evidence."); *Ramon*, 493 P.3d at 619–20 ("The *McHaffie* rule is . . . a blunt instrument to deal with that potential issue."). As the South Carolina Supreme Court explained, the preemption rule "gives impermissibly short-shrift to the trial court's ability to judge the admission of evidence and to

protect the integrity of trial, and to the jury's ability to follow the trial court's instructions." *James*, 661 S.E.2d at 331.

Even if it is somewhat duplicative to allow both claims, these courts reason, preventing plaintiffs from bringing even duplicative claims conflicts with liberal pleading rules and the general principle that the plaintiff is the master of her pleadings. *MV Transp., Inc.*, 433 S.W.3d at 336; *Binns*, 690 S.W.3d at 253. "Settled law allows a plaintiff to plead and prove multiple causes of action." *McQueen*, 202 N.E.3d at 279. Additionally, implementing the preemption rule requires "a significant departure from . . . well-established standards for summary judgment and judgment on the pleadings" because it instructs judges to categorically exclude claims early in a litigation, even if the facts generate a material fact issue. *MV Transp., Inc.*, 433 S.W.3d at 335.

Some non-preemption rule courts also reason that the rule can distort fault allocation by forcing jurors to assign all employer responsibility solely through the employee's negligence, while ignoring the employer's independent breach. *See Lorio v. Cartwright*, 768 F. Supp. 658, 660 (N.D. Ill. 1991); *Quynn*, 850 S.E.2d at 729–30; *Binns*, 690 S.W.3d at 251. They reason that adherence to the rule "would preclude the jury from apportioning fault to the employer," and as a result, "[a]ny allocation of relative fault among those persons at fault . . . could differ if one person's fault was excluded from consideration." *Quynn*, 850 S.E.2d at 729.

## C.

Having reviewed the relevant authorities, we conclude that a plaintiff cannot pursue a negligent retention claim when it is not disputed that the employee was acting within the scope of employment and that the employer is vicariously liable for the employee's negligence, if any. In addition to the many

practical and case management reasons in support of the preemption rule discussed above, we conclude the preemption rule follows from the very nature of the negligent retention tort as developed in Iowa.

The negligent retention tort allows a plaintiff an opportunity to impose liability on an employer for an employee's conduct when the employee is acting outside the scope of employment and vicarious liability would otherwise be unavailable. Properly conceived, the tort is an alternative to respondeat superior liability where respondeat superior liability is unavailable or otherwise contested and "all the requirements of an action of tort for negligence exist[]." *Schoff*, 604 N.W.2d at 53 (quoting Restatement (Second) of Agency § 213 cmt. *a*, at 458 (A.L.I. 1958)). As the Indiana Supreme Court explained, "an employer's admission that an employee was acting within the course and scope of his employment precludes negligent hiring claims." *Sedam*, 84 N.E.3d at 1178. "This outcome recognizes that a *respondeat superior* claim necessarily involves an act *within* the scope of employment, whereas negligent hiring claims require an act *outside* the scope of employment. Under each claim, the plaintiff seeks the same result— employer liability—and recovery is based on the same negligent act—the employee's." *Id.*

As in Indiana and the other states adopting the preemption rule, a claim for negligent retention under Iowa law, although distinct and not derivative, is tethered to the employee's underlying misconduct. Because of that, the claim for negligent retention is redundant where it is undisputed that the employee was acting within the scope of employment and that the employer is vicariously liable for the employee's negligence, if any. The negligent retention claim functions only as an alternative method—pursued under a different legal theory, to be sure, but

directed at the same underlying misconduct—to hold an employer liable for the employee's negligence.

The preemption rule is also consistent with the Iowa Comparative Fault Act. The Iowa Comparative Fault Act requires the trier of fact to determine "[t]he percentage of the total fault allocated to each claimant, defendant, third-party defendant, [and] person who has been released from liability." Iowa Code § 668.3(2)(*b*) (2022). Under the preemption rule, the employer's vicarious liability already captures the full measure of its employee's fault; the employer has already acknowledged its liability "for one hundred percent of the damages attributable to the employee's negligence." *Ferrer*, 390 P.3d at 845. Under the Iowa Comparative Fault Act, "[T]he court may determine that two or more persons are to be treated as a single party." Iowa Code § 668.3(2)(*b*). An employer who is vicariously liable for its employee's negligence is treated as a single unit with the employee for purposes of joint and several liability. *Biddle*, 518 N.W.2d at 798–99 (explaining that under Iowa's joint and several liability scheme, the employer and employee are treated as one unit when the employer is vicariously liable). Because the employer and the employee are treated as a single unit, the employer already bears the full percentage of fault allocated to the employee. There is no separate "employer fault" to allocate because the employer's liability is coextensive with the employee's. Adding a negligent retention claim does not create a new source of fault to be allocated. It merely introduces a second path to the same liability that the employer has already assumed. "All roads lead to Rome in a case such as this." *Bogdanski*, 408 P.3d at 1162.

One of the plaintiff's counterarguments against the adoption of the preemption rule in Iowa is a statutory argument. The general assembly recently passed legislation establishing a preemption rule for negligent hiring claims in

"any civil action involving the operation of a commercial motor vehicle requiring a commercial driver's license." 2023 Iowa Acts ch. 84, § 1 (codified at Iowa Code § 668.12A(1) (2024)). Applying the familiar canon of *expressio unius est exclusio alterius*, the plaintiff argues, leads to the conclusion that the legislature did not intend preemption in medical negligence cases. We are unpersuaded for several reasons. At the outset, we question whether this is a situation in which the canon applies, as it typically applies to inferences to be drawn from a single statute. Assuming it applies, it applies only weakly here. The canon of *expressio unius* is a canon of statutory construction. It aids in the interpretation of legislative enactments by drawing inferences from what the legislature included and excluded in a particular statute. But the preemption rule is a common law doctrine, developed by courts in the exercise of their authority to define the contours of common law torts. The legislature's decision to codify a preemption rule in one statutory context does not constrain this court's independent authority to adopt, modify, or reject a common law rule in another. Relatedly, this court had never addressed the question presented in this case. Whether this court would adopt the preemption rule was an open question under Iowa law at the time section 668.12A was adopted. The legislature therefore could not have been legislating against a backdrop of settled Iowa common law on the preemption question as there was no common law rule to preserve or displace. Section 668.12A is thus best read as a legislative determination that certainty was needed on this question in a specific, highly regulated and highly litigated industry, not as a legislative determination that preemption is inappropriate outside the commercial motor vehicle context. Finally, the statute does not sweep as far as the plaintiff contends. The statute extends only to negligent hiring

cases, which is not at issue here. By contrast, the preemption rule we adopt today applies to negligent hiring, retention, and supervision claims generally.

For these reasons, we hold that when it is not disputed that the employee was acting within the scope of employment and the employer is liable for the employee's negligence, if any, a claim for negligent hiring, retention, and supervision is precluded. The district court erred in holding otherwise.

### III.

We next address the district court's ruling on the availability of bystander emotional distress damages. The parties do not dispute that the district court properly granted summary judgment with respect to the damages sought by the Baldwins' children, who were not at the hospital at the time of the disconnection event. *See Fineran v. Pickett*, 465 N.W.2d 662, 664 (Iowa 1991) (holding that bystander emotional distress claims are limited to those at the scene when the allegedly negligent event occurs). The only issue presented in this case is whether Rhonda's request for bystander emotional distress damages fails as a matter of law. For the reasons expressed below, we conclude that it does.

In *Barnhill*, we set out the five elements that a plaintiff must satisfy to recover for a bystander emotional distress claim:

> 1. The bystander was located near the scene of the accident.
>
> 2. The emotional distress resulted from a direct emotional impact from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.
>
> 3. The bystander and the victim were husband and wife or related within the second degree of consanguinity or affinity.
>
> 4. A reasonable person in the position of the bystander would believe, and the bystander did believe, that the direct victim of the accident would be seriously injured or killed.
>
> 5. The emotional distress to the bystander must be serious.

300 N.W.2d at 108.

IMMC contends that Rhonda cannot prove she contemporaneously perceived the accident, as opposed to learning of it after it occurred, and that she therefore could not have reasonably believed Baldwin would be seriously injured or killed as a result of the accident. *See id.* The arguments are interrelated. According to IMMC, because Rhonda did not know the disconnection event occurred until after-the-fact, any belief that Baldwin's life was in danger could not have arisen from contemporaneous observation of the accident.

Rhonda correctly argues that contemporaneous perception does not require bystanders to *view* the accident as it occurred. *Martin v. Crook*, No. 08–1711, 2009 WL 2392077 (Iowa Ct. App. Aug. 6, 2009), is the most instructive Iowa case on that point. There, a family stopped on an icy interstate to help another vehicle that was stranded on the shoulder of the road. *Id.* at *1. While the husband stood outside the car rendering aid, a passing vehicle slid off the road and struck him. *Id.* at *2. The wife, who remained in the car with the children, testified that she saw "a red car in the rearview mirror . . . spinning [in] a circle" near where her husband was standing, turned to look out the back window, and realized that she did not see her husband anymore. *Id.* at *7. She then got out of the vehicle and saw her husband on the ground. *Id.* Although "she did not see the actual impact of [the defendant's] car striking her husband," and it was "[o]nly when she turned to look for [him] and did not see him [that] she realize[d] he had been hit by the car," the court of appeals held that her testimony created a jury question on whether she contemporaneously perceived the accident. *Id.* The wife's "failure to immediately 'process' what she was seeing [did] not defeat her claim as a matter of law." *Id.* The children in *Martin* did not

have a viable bystander liability claim. *Id.* at *8. "They were watching a movie in the minivan at the time of the accident," and "did not notice that anything had happened until [their mother] exclaimed [it]." *Id.* Because "[t]heir perceptions of the event did not commence until they saw their injured father lying in the snow after the fact," they could not meet the contemporaneous perception element. *Id.*

We agree with the defendants, however, that the issue before us is more nuanced than whether Rhonda hearing a "kabam" satisfies the contemporaneous perception requirement. The critical question is what exactly Rhonda perceived when she heard the noise. As explained, the second *Barnhill* element requires that the bystander perceived the accident. "The accident" is the injury-producing event itself, not merely a later manifestation of the resulting harm. In some contexts, the injury-producing event is immediately recognizable. In a car accident, for example, the accident is obvious because lay observers understand that vehicles are not supposed to collide and that collision itself causes injury. An example of a non-car accident case sufficient to take a bystander emotional distress claim to the jury is *Pollock v. Ottumwa Regional Mobile Intensive Care Services*, Nos. 0–631, 00–0040, 2000 WL 1825444 (Iowa Ct. App. Dec. 13, 2000). In *Pollock*, emergency responders placed the plaintiff's ill husband on a gurney to transport him from a home to an emergency vehicle, and while he was being carried, she saw her husband "was either dropped or he fell or rolled off of it and landed on the ground." *Id.* at *1. The court of appeals reversed summary judgment on the wife's bystander emotional distress claim, concluding that the claim should have been presented to the jury. *Id.* at *3–4. Although the precise negligence involved was not immediately apparent, the accident was obvious. *See id.* at *1, *3.

Awareness of the accident is less apparent in other contexts, in particular, in the context of a medical malpractice case arising out of actions in a critical care unit, where a tragedy could result from any number of errors or no error at all, and where the injury-producing event may be invisible to the lay observer. For example, in *Bird v. Saenz,* 51 P.3d 324, 328–29 (Cal. 2002), the California Supreme Court held that plaintiffs could not show that they were contemporaneously aware of the injury-producing event. The plaintiffs saw their mother rushed down a hospital hallway. *Id.* at 326. She was "bright blue," feet "way up in the air," with doctors and nurses surrounding her. *Id.* But the plaintiffs did not perceive the medical error itself. *Id.* at 328–29. Because the plaintiffs' emotional distress arose from witnessing the medical crisis and its aftermath, rather than from contemporaneous awareness of the injury-producing event, their claims failed as a matter of law. *Id.* The *Bird* court explained that:

> This is not to say that a layperson can never perceive medical negligence, or that one who does perceive it cannot assert a valid claim for NIED. To suggest an extreme example, a layperson who watched as a relative's sound limb was amputated by mistake might well have a valid claim for NIED against the surgeon. Such an accident, and its injury-causing effects, would not lie beyond the plaintiff's understanding awareness. But the same cannot be assumed of medical malpractice generally.

*Id.* at 329.

We find the *Bird* court's reasoning sound, but we clarify a point. A bystander need not appreciate at the time of perception that the injury-causing conduct was tortious, in the legal sense. *See id.* at 331. However, the bystander still must perceive *the accident* and that *the accident* caused harm to a close relative. *See id.* As the *Bird* court explained, the nature of medical treatment makes it difficult for bystanders to meet this requirement because

unlike other catastrophic events such as "explosion[s], traffic accident[s], or electrocution[s]," negligent medical treatment is an injury-producing event that is not often perceived as it is unfolding and is therefore not ordinarily "a component of [the bystander's] emotional trauma." *Id.* As the court explained, a witness to a fatal car accident understands that the driver's conduct caused the death, even if she does not yet know whether the driver was intoxicated. *Id.* But it is a "giant leap" to impose bystander liability "based on nothing more than a bystander's 'observation of *the results* of the defendant's infliction of harm,' however 'direct and contemporaneous.' " *Id.* (quoting *Mobaldi v. Bd. of Regents*, 127 Cal. Rptr. 720, 727 (Ct. App. 1976), *overruled in part by*, *Elden v. Sheldon*, 758 P.2d 582 (Cal. 1988) (en banc)).

Here, Rhonda perceived that something occurred, but the record does not support a finding of contemporaneous perception of an injury-producing event distinct from her husband's underlying medical condition. Rhonda testified that she was watching television beside Baldwin's bed when she heard a "kabam," but she "didn't realize what had happened then." She assumed that Cline dropped the bed when she was lowering it. She "thought immediately, well, maybe he's too heavy to lift up with the bed." It was only when Cline yelled for help and hospital staff came rushing into the room that she realized something had gone wrong. She was removed from the room and escorted to a conference room. Some time later, Rhonda learned that a line had disconnected. Rhonda perceived a noise and the commotion that resulted, but her awareness of the injury-producing event—and the connection between that event and Baldwin's cardiac arrest—came from what she was told later. Accordingly, we hold that Rhonda's claim fails as a matter of law.

IV.

Finally, we must decide whether the district court erred in denying the motion for summary judgment with respect to punitive damages. We note that several courts adopting the preemption rule have recognized an exception permitting a negligent retention claim to proceed when the plaintiff has a viable claim for punitive damages against the employer based on the employer's own conduct in retaining the employee. *See, e.g., Ferrer,* 390 P.3d at 845–46; *McHaffie,* 891 S.W.2d at 826. The district court relied on this exception as an alternative ground for denying summary judgment on the negligent retention claim, reasoning that Rhonda had presented a viable punitive damages claim. We need not decide whether to adopt such an exception in this case because, as we explain below, Rhonda has not produced sufficient evidence to generate a triable issue of fact on punitive damages.

Punitive damages are recoverable when a plaintiff proves "by a preponderance of clear, convincing, and satisfactory evidence" that "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code section 668A.1(1)(*a*). We have explained that punitive damages are "only appropriate when a tort is committed with 'either actual or legal malice.' " *Wolf v. Wolf,* 690 N.W.2d 887, 893 (Iowa 2005) (quoting *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 378 (Iowa 1997)). Such culpability may be shown by "personal spite, hatred, or ill-will" or "by wrongful conduct committed with a willful or reckless disregard for the rights of another." *Id.* (quoting *Jones,* 569 N.W.2d at 378); *see also Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990) (en banc) (stating that someone acts with a "willful and wanton disregard" when she "has intentionally done an act of an unreasonable character in disregard of a known

or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences" (first quoting Iowa Code § 668A.1; and then quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984))).

Rhonda points us to the opinion of her expert, Mayfield, who opined that Cline's conduct in the prior case involving a patient death was reckless and should have resulted in her immediate termination, and to the testimony of IMMC's nurse manager, Smith, who agreed that she would not want to retain a nurse who was responsible for a patient's death. We cannot say based on these conclusory opinions that IMMC acted with malice when it retained Cline, a licensed nurse. Because the punitive damages claim fails on the merits, any exception to the preemption rule predicated on a viable punitive damages claim based on IMMC's conduct is inapplicable here.

Rhonda also urges that IMMC can be held liable for punitive damages based on Cline's conduct under the circumstances presented here. In Iowa, employers may be held "liable for punitive damages for the willful acts of employees committed within the scope of employment . . . only when the corporate employer wrongfully authorized, contributed to, or ratified the outrageous conduct which caused plaintiff's injury." *Briner v. Hyslop*, 337 N.W.2d 858, 861 (Iowa 1983) (en banc). Rhonda argues that IMMC contributed to the underlying conduct by recklessly retaining Cline despite her alleged unfitness for the position and that IMMC ratified Cline's recklessness when it declined to terminate her employment and determined after an internal investigation that Cline's conduct was appropriate. *See id.* These arguments presuppose that Cline's underlying conduct was outrageous and supports an award of punitive damages.

When the summary judgment record is viewed in the light most favorable to the plaintiff, we cannot conclude that there is a triable issue of fact on the plaintiff's claim for punitive damages. The evidence against Cline sounds in negligence: that CRRT line disconnection carries a known risk of serious injury or death, Cline used a tourniquet or improper equipment to secure the lines, Cline failed to properly inspect and document the lines, Cline ignored CRRT alarms earlier in the day, and her actions violated hospital policies.[2] Rhonda also points to expert testimony from Mayfield. Mayfield's report concludes that Cline "breached the standard of care because she allowed the lines to become disconnected" and "she used a tourniquet to secure the CRRT lines to the bedrail," among other alleged breaches. He states that "[a]ny reasonable nurse knows that a patient can move and that you never cut off slack in the lines, especially between the bed rail and a line connected to a catheter in a patient's neck." "Mere negligent conduct is not sufficient to support a claim for punitive damages." *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (en banc). Cline's alleged negligence, even if true, does not rise to the "extreme" and "outrageous" conduct necessary to justify a punitive damages award. *Briner*, 337 N.W.2d at 867–68.

While Mayfield also characterized Cline's conduct as "reckless" and "indefensible," the use of the word "reckless" is not enough to create an issue of fact on punitive damages. We recently made clear that "a conclusory opinion" accompanied by "no independent factual investigation" and "lack[ing] any factual detail" or "analysis supporting an inference that [the] conduct was intentional rather than merely negligent" is insufficient to carry a case past summary

---

[2]IMMC disputes the admissibility of much of this evidence. We assume without deciding that the evidence would be admissible because that assumption does not affect the outcome here.

judgment on the question of recklessness. *Rose v. Oakland Healthcare Mgmt., LLC*, 30 N.W.3d 724, 731 (Iowa 2026). Nothing in this record shows that Cline acted with "personal spite, hatred, or ill-will" or "with a willful or reckless disregard for the rights of another." *Wolf*, 690 N.W.2d at 893 (quoting *Jones*, 569 N.W.2d at 378). IMMC, which is only vicariously liable for Cline's conduct, cannot be held liable for punitive damages based on Cline's nonpunitive conduct.

## V.

For these reasons, we conclude that the district court erred in denying the defendant's motion for summary judgment as to each claim.

**Reversed and Case Remanded.**